Donald L. **JUSTARD**

v.

**OXFORD PAPER COMPANY et al.**

Supreme Judicial Court of Maine.

Nov. 18, 1974.

Fred E. Hanscom, Rumford, for plaintiff.

Mahoney, Robinson, Mahoney & Norman by James S. Kriger, Robert F. Hanson, Portland, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

On February 12, 1973 Donald L. Justard (hereinafter "petitioner") filed with the Industrial Accident Commission a petition seeking an award of compensation on account of a personal injury allegedly sustained by him in June, 1972 by accident arising in the course, and out, of his employment at Rumford, Maine, with respondent, Oxford Paper Company. The petition described the incident as follows:

"Worked considerable overtime leading up to the loss of sight of left eye."

Petitioner was employed as a checker in the shipping department. He had work responsibility in connection with the preparation of freight cars to contain rolls of paper being shipped from the mill. Specifically, petitioner's duties were to drive the trucks from which the paper rolls were loaded into the freight cars and to inspect the rolls of paper to ensure they would be placed into the proper cars.

In answer to the petition respondent paper company and its insurance carrier, Travelers Insurance Company, admitted the employment but denied that petitioner had received

"a personal injury by accident arising out of and in the course of his employment."

After a hearing at which the petitioner and Dr. J. Wayne Tyler (an ophthalmologist) were the only witnesses, the Industrial Accident Commission Commissioner, on September 25, 1973, ordered that

"compensation be paid to the employee for a period of twenty-eight weeks beginning on July 3, 1972 at the rate of $81.14 per week and then cease."

The evidence disclosed that petitioner was often obliged to work "merry-go-round", so-called. This meant that during a period (for example) of a Thursday to Saturday, petitioner would work 11:00 p. m. (Thursday) to 7:00 a. m. (Friday), 3:00 p. m. to 11:00 p. m. (Friday) and 7:00 a. m. to 3:00 p. m. (Saturday). On some occasions, if there was no "mate" to relieve him while he was working a "merry-go-round", petitioner would work two of the eight hour shifts successively, a so-called "16."

During the week ending June 12, 1972, petitioner worked a total of sixty-four hours, including a "merry-go-round" and a "16." On or about June 9, 1972 petitioner, who had not previously had eye-trouble, noticed that his left eye had become very red. He went immediately to the medical department and there a nurse, "put some salve and some drops in my eye . . . ." On instructions from the nurse petitioner returned for several days thereafter to the medical department for further treatment of his eye by the nurse.

On June 13, 1972 petitioner went to work on the 3:00 p. m. shift and "got stuck" into working seventeen consecutive hours before he was relieved at approximately 8:00 a. m. on June 14, 1972. He was then leaving the mill when the sight in his left eye, in petitioner's words, "dropped out on me." Petitioner explained in his testimony this meant that he did not experience any pain but the vision in his left eye "just let go."

Later the same day, petitioner was examined by Dr. J. Wayne Tyler. Dr. Tyler testified that he found an

"inflammation [generalized] of the interior of the eye and an increase in the intraocular pressure, . . . due to the inflammation"

in that

". . . sometimes in the presence of inflammation the out-flow channels inside the eye become plugged by debris so that the fluids . . . formed within the eye cannot escape and the pressure rises . . . ."

Dr. Tyler prescribed, as treatment, prednisone pills and eye drops of two types each to be used two or three times a day. Dr. Tyler authorized petitioner to return to work with his left eye covered by a patch. Dr. Tyler expected the symptoms would run "a prolonged course", and so he kept check on petitioner "very regularly" thereafter for many weeks.

Petitioner's need for increasingly frequent administrations of medication, and difficulties he encountered because the prednisone medication aggravated a pre-existing diabetic condition, forced petitioner to cease working as of July 3, 1972.

The impairment of the vision in petitioner's left eye, according to Dr. Tyler's testimony, worsened from an initial "blurring" to the loss of "all useful vision" as of August 6, 1972.

Late in September of 1972 Dr. Tyler concluded that another physician should be consulted. He arranged for petitioner to see Dr. Kevin Hill, an ophthalmologist practising in Waterville, Maine. In early October of 1972 Dr. Hill examined petitioner and made a diagnosis that the retina of petitioner's left eye had become detached. Surgery was performed on October 11, 1972 but the sight of the left eye could not be restored.

In awarding petitioner compensation, the Commissioner concluded: (1)

"the sudden 'dropping out of sight' as . . . [petitioner] was leaving his employment was an accident within the meaning and intent of 39 M.R.S.A. § 51";

and (2)

". . . this condition 'arose out of' the . . . employment . . . because of the long hours of work . . . ."

The Commissioner added a third conclusion that

"petitioner has sustained his burden of proof on . . causation because it is more likely that his condition was caused by the strain of the work conditions tha[n] it is not."

In reaching his conclusions as to "causation", the Commissioner explained that, according to his conception, the "medical" and "legal" approaches to the "assessment" of causation are fundamentally different; and, hence,

"there are many questions of causation . . . which are presently unanswerable . . . and must properly remain unanswered . . . ."

under "standards of discipline of the medical profession" which by "legal" standards are capable of being answered, must be answered and are answered by the Commissioner's decision in the case at bar. Here, the Commissioner concluded that, measured by the appropriate "legal" standards, petitioner had carried the burden of proof to show "legal" causal relationship between his employment and the vision impairment of his left eye notwithstanding Dr. Tyler's testimony that when the question is considered strictly in "medical" terms, some "conjecture" is involved.

The Commissioner revealed in the written opinion explaining his decision that his causation analysis had been influenced in part by material which had not been introduced in evidence by the parties. We have this subject-matter before us because the Commissioner annexed a copy of it to his opinion as an exhibit and expressly incorporated it as a part of his decision.

Although within its own confines the document appended makes no mention of its authors or otherwise identifies itself as to source, the Commissioner attributed it to Elliot L. Segall, M.D., Boston, and Robert E. Fast, Esq., "Partner Hale and Dorr." Further, the Commissioner described the exhibit as connected with "Medicine in the Court Room 1971." Such description leaves us uninformed concerning the origins of the material and how the Commissioner came upon it, since "Medicine in the Court Room 1971" could indicate a published summary of views expressed in a symposium, or a published article (the publication, however, remaining unidentified) or even a condensation of conclusions made by a "Hale and Dorr" partner who had participated as a member of a panel, or symposium, and retained the summary in the internal files of the law firm.

The exhibit delineates in a seriatim outline form, without amplifying analysis or documentation, various respects in which the "medical and legal approaches to causation assessment" may be conceived to differ.

We agree with respondents that the opinon of the Commissioner establishes on its face that the Commissioner gave *evidentiary* weight to the contents of the document which the Commissioner had made an exhibit in the case after hearing had been concluded; and the Commissioner thus acted (1) without consultation with counsel for the parties, and (2) notwithstanding that the two persons whose opinions were reflected had never been qualified in the case as experts and had never given their opinions as testimony under oath and subject to the testing of cross-examination. In this respect, the Commissioner committed error sufficiently serious to require that his evaluation of the case, in the form in which it is now before us, cannot stand.

The critical issues of the instant case were recently and comprehensively evaluated by this Court in Towle v. Department of Transportation, State Highway, Me., 318 A.2d 71 (1974) decided several months

after the Commissioner's decision. Since the opinion of the Commissioner reveals that he was troubled by the interrelationships between medical facts and opinions and the legal standards of causation, the analysis in *Towle,* supra, not available to the Commissioner when he was struggling with the problems in September of 1973, could furnish him with substantial guidance in his reconsideration of the case.

Moreover, the record presently before us reveals that it was the medical opinion of the witness, Dr. Tyler, that had petitioner in fact been "working long hours and worked several 16's", such circumstances

". . . would . . . be a contributing factor . . . one of the contributing factors"

to the loss of vision in petitioner's left eye (resulting from a detached retina, as ultimately diagnosed). Because of this testimony the record as now before us, evaluated most favorably to petitioner in accordance with the legal principles extensively analyzed in *Towle,* supra, cannot fairly be said to foreclose as a rational possibility a fact-finder's conclusion, were it to be reached properly without resort to extraneous matters not in evidence, that petitioner had sustained a compensable injury.[1]

In Severance v. State of Maine, Department of Transportation, Me., 324 A.2d 314 (1974), while we acknowledged that the "one day in court" principle generally underlying the determination of civil actions is applicable to cases decided by the Industrial Accident Commission, we were careful to stress that in the situations in which a Commissioner's decision cannot be permitted to stand as written, and a remand of the case to the Commission for further evaluation is necessary, instances may arise in which justice requires that such Commission reevaluation shall not be confined to the record already made but shall be upon a record amplified by additional evidence to be adduced through further hearing.

Since, here, (1) the Commissioner's decision cannot be permitted to stand and the case must be remanded to the Commission for further consideration, and (2) neither the Commissioner nor counsel for the parties had the benefit of our opinion in *Towle* when the present record was being made, we believe justice requires that the Commissioner's new evaluation be made after a further hearing in which the parties, as they may be guided by the exposition in *Towle,* shall have opportunity to bring forward such additional evidence as they deem appropriate.

The entry is:

Appeal sustained.

The pro forma decree of the Superior Court is vacated.

Case remanded to the Industrial Accident Commission for further hearing.

Ordered that $350.00 to cover fees and expenses of counsel for the petitioner be, and is, allowed, to be paid by Appellant, Oxford Paper Company, to the Appellee, Donald L. Justard.

All Justices concurring.

---

1. In light of the ultimate diagnosis by Dr. Hill that petitioner suffered a detachment of his retina as the underlying cause of his loss of vision, a fact-finder would be warranted in a conclusion, were he to see fit to arrive at it, that, here, there exists (1) the kind of "internal breakdown of . . . structure" which *Towle* reveals may constitute "a personal injury by accident" should it result from the "stress of labor aggravat[ing] or accelerat[ing] the development of a preexisting infirmity" (p. 72 of 318 A.2d), such that (2) it may be regarded as a personal injury by accident which arises out of the employment if the aggravating or accelerating "stress of labor" is from the labor required by petitioner's employment.