**Abdollah S. GASHGAI, M. D.**

**v.**

**The BOARD OF REGISTRATION IN MEDICINE of the State of Maine.**

Supreme Judicial Court of Maine.

Aug. 24, 1978.

Skelton, Taintor & Abbott, P.A. by Charles H. Abbott (orally), Lewiston, Locke, Campbell & Chapman, Frank G. Chapman, Augusta, Leva, Hawes, Symington, Martin & Oppenheimer, Cathleen H. Douglas, Washington, D. C., for plaintiff.

Sanborn, Moreshead, Schade & Dawson by Peter T. Dawson (orally), Augusta, for defendant.

Before McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD, GODFREY and NICHOLS, JJ.

NICHOLS, Justice.

By complaint dated July 25, 1974, the Board of Registration in Medicine, which is the administrative agency responsible for the licensing and discipline of physicians, commenced proceedings against Appellant, Abdollah S. Gashgai, M. D., a duly licensed physician. *See* 32 M.R.S.A. §§ 3263 *et seq.* The Board charged Dr. Gashgai with "unprofessional conduct," within the meaning of 32 M.R.S.A. § 3282(5).

After a hearing, the Board placed Dr. Gashgai on probation for one year and directed that he file periodic affidavits demonstrating appropriate corrective action as to his billing and testing practices.

Thereupon Dr. Gashgai sought judicial review of the Board's decision in Superior Court (Kennebec County) pursuant to 32 M.R.S.A. § 3283 and M.R.Civ.P. 80B, and invoking the Fourteenth Amendment to the United States Constitution. After considering the record of the Board's hearing, and holding an evidentiary hearing limited to the issue of bias on the part of Board members, the court below ordered judgment for the Defendant Board. A motion

by Dr. Gashgai for findings of fact and conclusions of law was denied. He then brought his appeal here.

We sustain the appeal, concluding that as to one charge there was no evidence to support the Board's decision, and as to the other charge the Board failed to make such findings of fact as would undergird its conclusion of law.

The two charges which the Board made in its complaint against this physician were as follows:

a. Between July 19, 1973 and November 30, 1973 . . . [Dr. Gashgai] . . . administered to at least fifty (50) patients multiple diagnostic laboratory procedures . . . which were conducted without apparent prior physical examination or with [sic] medical justification and did submit invoices therefor to the Department of Health and Welfare of the State of Maine in the total amount of $2,092.00.

b. Between November 26, 1973 and November 29, 1973 . . . [Dr. Gashgai] . . . did willfully and intentionally make or authorize to be made a false and fraudulent statement to the State of Maine Department of Health and Welfare . . to the effect that . . . [he] . . had to close his office and spend 24 hours a day with a patient on November 26th, 27th, 28th, and 29th, which statement . . . [Dr. Gashgai] . . . knew or should have known was false or fraudulent because in truth and fact on said dates the Defendant maintained office hours and

saw at least 26 patients and did submit invoices therefor for payment to the State of Maine Department of Health and Welfare.

These charges appear to have had their genesis in an investigation conducted by George E. Sullivan, M. D., as a consultant to the State Department of Health and Welfare. Originally, the charges were turned over to the Ethics and Discipline Committee of the Maine Medical Association, a private, voluntary association of medical practitioners. In *Gashgai v. Maine Medical Association*, Me., 350 A.2d 571 (1976), this Court upheld a permanent injunction, suppressing the report of that Committee and prohibiting its distribution, where the Committee had violated the Association's by-laws in conducting its "investigation" of Dr. Gashgai.

■ While that case was still pending in Superior Court, the Board commenced the instant proceedings. Dr. Sullivan signed the complaint in his capacity as Secretary of the Board. Dr. Sullivan also sat with the Board during its hearing, and, by his own admission, he had a copy of the suppressed report.[1]

The first charge related to invoices which Dr. Gashgai's Chisholm office submitted to the Department of Health and Welfare for laboratory work performed for welfare patients. The record contains some 35 exhibits involving such work, although the transcript indicates that the Board considered only some 15 as a representative sample. Indeed, there is no indication that the Board's exhibits numbered 19–37 were even admitted into evidence, although they constitute part of the record before us.[2]

1. Since counsel for Dr. Gashgai expressly waived any objection to Dr. Sullivan's sitting with the Board during the hearing, and since Dr. Sullivan disqualified himself from any "judiciary process," we do not make this issue dispositive, although Dr. Gashgai now asserts that Dr. Sullivan and the suppressed report did influence the Board. Nevertheless, we observe that the combination of investigator, prosecutor and sitting member of the adjudicatory panel, even if ostensibly a nonparticipating member, creates an intolerably high risk of unfairness. *See Withrow v. Larkin*, 421 U.S. 35, 58,

95 S.Ct. 1456, 1470, 43 L.Ed.2d 712, 730 (1975). We shall not approve that practice in our review of future proceedings of this Board or those of other administrative agencies.

2. The Board's exhibits numbered 3 through 18 (excluding exhibit 10A) all seem to involve the same series of laboratory tests, which we infer from testimonial references thereto is the SMA6 series. These exhibits were actually admitted into evidence during the hearing. Exhibits numbered 20 through 37 appear to involve the same series of tests; however, there

Of particular interest to the Board was the recurrence of a battery of blood tests, described as the SMA6, taken from a single sample of blood, which tested for a number of problems, such as anemia, diabetes, hemoglobin, BUN and albumin. What the Board's experts, and the Board members themselves, appeared to find unusual about these invoices, was that they showed a pattern of testing which, while perhaps justifiable in a given case, showed no apparent medical justification on the invoice. For example, it was stated that a possible diagnosis of gout in a young child (2 or 3 cases) was so unlikely as to be without medical basis.

The second charge related to Dr. Gashgai's treatment of a patient to whom he had been assigned while on call at the Gardiner hospital. Because of her serious condition, this patient was admitted at his direction to the Intensive Care Unit of Augusta General Hospital at 8:00 A.M. on November 26, 1976. She expired there at 7:25 A.M. three days later.

Initially, this patient was accepted as a "charity" case because, while listed as "self-paying," it was determined that she had no ability to pay. Therefore, it was anticipated that no bill would be rendered, even though normally one would be prepared for accounting purposes. Subsequently, however, the Department of Health and Welfare retroactively (and posthumously) determined that this patient qualified for welfare benefits.

Dr. Gashgai's office submitted an invoice to the Department for a total of $400.00, based on charges of $100.00 per day for four days. Because this amount was more than Dr. Gashgai's usual charge for hospital visits, the following was written on the invoice:

Note—I have charged $100 a day for her care because I spent 24 hrs. a day with

her and had to close my office to attend her.

This invoice was submitted over a facsimile of Dr. Gashgai's signature, which was put on with a rubber stamp by Diane Lavoie, who handled the doctor's insurance billing. Both Dr. Gashgai and Mrs. Lavoie testified without contradiction that Dr. Gashgai had no prior knowledge of this statement.

Dr. Gashgai admitted that he did not spend literally 24 hours a day with the patient. However, the uncontradicted testimony of the patient's daughter and a staff physician at Augusta General Hospital, as well as Dr. Gashgai's own testimony, disclosed that Dr. Gashgai did spend a great deal of time at that hospital and was on constant call on the case.

Dr. Gashgai's office submitted invoices to the Department of Health and Welfare for office visits for patients during the same time period. It was this discrepancy that apparently triggered the investigation. These invoices covered patients who could be grouped into three categories: (1) those that Dr. Gashgai actually saw in his Augusta office, which was in close proximity to the hospital; (2) those that he actually saw in his Chisholm office during a brief period of office hours;[3] and (3) those who came into his Chisholm office and were seen by one of his (non-physician) assistants, who would relay the problem by telephone to Dr. Gashgai in Augusta; Dr. Gashgai would then prescribe for the patient over the telephone or instruct the patient to return in a few days.

It was upon the evidence summarized above that the Board made its findings that Dr. Gashgai conducted "extensive and unnecessary multiple diagnostic laboratory procedures" and that he made "or caused to be made a knowingly false statement."

is no indication on the record that these were admitted or considered by the Board. *See Justard v. Oxford Paper Co.*, Me., 328 A.2d 127, 129 (1974). Exhibit number 19 was never mentioned during the hearing; due to "x-outs" on this exhibit we are at a loss to understand what it purports to show.

3. The record indicates that on the one day during this four-day period when he did attempt to hold office hours at Chisholm, he was forced to rush back to Augusta with a police escort to attend his patient.

**1084**

## I.

■ We turn initially to the second specification, that Dr. Gashgai knowingly made, or caused to be made, a false or fraudulent statement. "Unprofessional conduct" is defined in 32 M.R.S.A. § 3282(5) to include the following:

J. Knowingly making any false or fraudulent statement, written or oral, in connection with the practice of medicine, except as the same may be necessary for therapeutic purposes.

The Board's decision that Dr. Gashgai was in violation of the sub-section cannot stand. There is no evidence in the record that would support a factual finding that Dr. Gashgai knowingly made a false or fraudulent statement regarding closing his office and rendering continuous care to a patient, because the record affirmatively shows that he did not make or authorize the statement, nor did he have any prior knowledge thereof.

Even if the Board was purporting to proceed on the theory that Mrs. Lavoie's knowledge of any falsity could be imputed to Dr. Gashgai (the applicability of this concept is doubtful in light of the statutory language), there was no evidence to support a finding that Mrs. Lavoie knew the statement was false, if in fact it was. She obtained her information from a discharge summary prepared by Dr. Gashgai, and from her own knowledge that the doctor had been absent from his Chisholm office for almost all of the period in question. At most, the record discloses a negligent misstatement by Mrs. Lavoie; it does not demonstrate a knowingly false statement by Dr. Gashgai.[4]

Therefore, on remand to Superior Court, Dr. Gashgai is entitled to a judgment reversing the Board's decision with respect to the second specification, having knowingly made or caused to be made a false or fraudulent statement.

## II.

As to specification (a) of the Board's Complaint, the Board found that Dr. Gashgai ". . . administered or caused to be administered extensive and unnecessary multiple diagnostic procedures . . ." which it apparently concluded was a violation of the following sub-section of 32 M.R.S.A. § 3282(5):

H. Conduct unbecoming a person licensed to practice medicine or detrimental to the best interest of the public health or safety . . . .

■ Our conclusion that the Board's decision on the other specification is without evidentiary support renders suspect the decision on this specification, especially in light of Dr. Gashgai's arguments that the Board, or at least some members thereof, misapplied the burden of proof[5] and were biased against him.[6] These arguments are

---

4. In this case we are not required to address the question of whether a physician can be found to have committed "unprofessional conduct" within 32 M.R.S.A. § 3282 by negligently supervising, or failing to supervise, his non-physician staff. Cf. Lewis v. District of Columbia Comm'n. On Licensure, 385 A.2d 1148 (D.C. App.1978).

5. Rule 11(J) of the Board expressly provided that in any disciplinary action, the Board should have the burden of proof. Nevertheless, well into the hearing, the Chairman indicated that he thought the burden of proof was on Dr. Gashgai. The Board asserts that this mistaken impression was corrected, but the record does not clearly reflect that it was. Moreover, the Board's totally unsupported decision on the other specification lends strong support to Dr. Gashgai's argument. Because of our disposi-

tion of this appeal it becomes unnecessary to address the issue of burden of proof.

6. After the evidentiary hearing on the issue of bias, and after reading the record, the presiding justice stated that ". . . I can make one finding of fact, quite obvious to me: that there was a considerable amount of bias and prejudice on the part of the Board." He went on, however, to indicate that most of the Board's animosity appeared directed to Dr. Gashgai's attorneys and to the legal profession generally. In his original order and in his order denying the motion for findings of fact, the presiding justice made no express finding on bias or prejudice.

While we rest our decision on other, narrower grounds, we deplore the remarks made by some Board members. The minimal requirements of administrative fair play, while less

substantial but not dispositive. On a narrower ground, we conclude that the Plaintiff is entitled to have the Board's decision vacated. We hold that the Board's decision lacks the findings of fact which are essential for meaningful judicial review.

■ As Professor Cooper has declared, it is an indispensable prerequisite to effective judicial review that an agency's decision set forth the findings of basic fact as well as the conclusions of ultimate fact and conclusions of law derived therefrom. 2 F. Cooper, *State Administrative Law* 465 (1965). Professor Davis has observed that the bulk of judicial opinions are concerned with determining just how detailed the required findings should be. 2 K. Davis, *Administrative Law Treatise* § 16.01 (1958). *See, e. g., Theriault v. Walsh Construction Co.*, Me., 389 A.2d 317 (1978).

■■ The practical reasons for requiring administrative findings are several. Such findings of fact facilitate judicial review, avoid judicial usurpation of administrative functions, assure more careful administrative consideration, help parties plan their cases for rehearings and judicial review, and keep agencies within their jurisdiction. *Davis, supra*, § 16.05. Courts need to know what an agency has really determined in order to know even what to review. *See City of Yonkers v. United States*, 320 U.S. 685, 694–695, 64 S.Ct. 327, 88 L.Ed. 400 (1944) (Frankfurter, J., dissenting). "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." *United States v. Chicago, M., St. P. & P. R. R.*, 294 U.S. 499, 510–511, 55 S.Ct. 462, 467, 79 L.Ed. 1023 (1935). *At-*

chison, T. & S. F. R. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 805–806, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *Dunlop v. Bachowski*, 421 U.S. 560, 573–574, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975).[7]

The requirement of administrative findings is well established in Maine in the field of workmen's compensation law. 39 M.R. S.A. § 39; *Dufault v. Midland-Ross of Canada, Ltd.*, Me., 380 A.2d 200 (1977). A few weeks ago the same requirement of "a finding supported by evidence in the record" was observed in the field of public utilities law. *New England Tel. & Tel. Co. v. Public Util. Comm'n.*, Me., 390 A.2d 8 (1978). Although not applicable to the case at bar in its present posture, Maine's new Administrative Procedure Act, 5 M.R.S.A. § 8001 *et seq.* (1977 Supp.), effective July 1, 1978, imposes a similar requirement. *See* 5 M.R. S.A. § 9061 (1977 Supp.).

The case at bar is an eminent example of the importance of the requirement, generally if not universally observed, that an administrative agency articulate the findings of fact upon which its decision is based. Here we are left completely in the dark as to how many "multiple diagnostic procedures" the Board found that Dr. Gashgai had performed, and upon what basis the Board concluded that this amount was "extensive and unnecessary."

The original complaint alleged that Dr. Gashgai administered such tests to "at least fifty" patients during the period in question. If the Board's decision reflected a finding that this charge was proved, we would be compelled to reverse the decision

---

than that demanded of our courts, require something more than unfettered administrative action. *In Re Maine Clean Fuels, Inc.*, Me., 310 A.2d 736, 746 (1973). Regardless of the personal feelings of Board members toward Dr. Gashgai, his manner of practicing medicine, his attorneys, or the legal profession generally, the Board must sit in impartial judgment of any allegations of misconduct.

7. An exception to this general rule was made when the Board of Environmental Protection without a hearing denied a Plaintiff's two applications for certification of a barkoil boiler as a water and air pollution control facility. In its

decision that Board did not articulate the basic facts from which its conclusions were derived. *Upon appeal a divided court found the procedure on that particular case satisfied the then requirements of law. Ethyl Corp. v. Adams*, Me., 375 A.2d 1065, 1079 (1977) [Pomeroy and Wernick, JJ., dissented as to the manner and scope of judicial review.] The Maine Administrative Procedure Act has since been enacted, requiring state agencies governed thereby to include in each decision findings of fact sufficient to apprise the parties and any interested member of the public of the basis of the decision. *See* 5 M.R.S.A. § 9061.

on this specification. The Board considered at most only about 35 invoices and possibly as few as 15. There is no evidence in the record to support the original allegation of at least 50 medically unjustified tests. If, on the other hand, the Board's decision rested upon a finding that the tests administered to young children, in part because of a "question of gout," were without medical justification, the Board should have said so. The reviewing courts could then determine whether this conduct was of such a magnitude as to fall within the statutory proscription.

The courts must also know whether the Board was concerned with the financial implications of any overtesting, or with its medical implications, or both. In the record before us there is no discussion of any possible adverse effects upon the patients to whom the SMA6 tests were given. Nevertheless, the Board might have concluded that medically unjustified testing, even without substantial risk to a patient, was professional misconduct; it might have decided that the tests cost more than their diagnostic worth for the patients in question; or it might have concluded that Dr. Gashgai was overtesting for monetary gain.[9]

Neither the administrative nor the judicial process would be enhanced were we to attempt to review the Board's decision based upon our hypothesis of what the Board might have found from the evidence before it. When an administrative agency completes its task by making specific findings of fact to support its decision, the courts are in a far better position to discharge their limited duty of reviewing the administrative decision for errors of law.

The entry is:

Appeal sustained.

Judgment set aside.

9. At least two other interpretations of the record are possible: (1) Dr. Gashgai used poor medical judgment, without any bad motives, in ordering the tests; or, (2) Dr. Gashgai was more thorough than necessary either because of fear of malpractice claims, or from extreme conscientiousness.

Remanded to Superior Court with directions (1) to enter judgment on specification (a) of the Board's Complaint, vacating the decision of the Board and remanding to the Board for further proceedings consistent with the opinion herein; and (2) to enter judgment on specification (b) for the Plaintiff, reversing the decision of the Board.

DELAHANTY, J., did not sit.

McKUSICK, C. J., and POMEROY, WERNICK, ARCHIBALD and GODFREY, JJ., concurring.

It is not our task to draw any of these inferences from the evidence. We mention these possible interpretations merely to underscore the need for specific findings. We emphasize that we are speaking only of *possible* interpretations and we do not intimate that any of these hypothetical interpretations in fact apply.