CITY OF BANGOR

v.

AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 74, and Maine Labor Relations Board.

Supreme Judicial Court of Maine.

Argued June 16, 1982.

Decided Sept. 8, 1982.

Malcolm E. Morrell, Jr., Eaton (orally), Peabody, Bradford & Veague, Clare Hudson Payne, Bangor, for plaintiff.

Sunenblick, Fontaine & Reben, Stephen P. Sunenblick (orally), Portland, for A.F.S. C.M.E.

Wayne W. Whitney, Jr., Maine Labor Relations Board, Augusta (orally), for defendants.

Before McKUSICK, C. J., NICHOLS, VIOLETTE, WATHEN, JJ., and DU-FRESNE, A.R.J.

VIOLETTE, Justice.

The plaintiff, the City of Bangor, has appealed from a Superior Court (Penobscot County) judgment affirming in part and modifying in part an order of Maine Labor Relations Board [hereinafter referred to as the MLRB] requiring the city to cease and desist from engaging in certain employment practices and to offer reinstatement, and award back pay and various benefits to several employees who were unlawfully dis-

charged. The defendants, the American Federation of State and County Municipal Employees, Council No. 74 [hereinafter referred to as the AFSCME] and the MLRB, have cross-appealed from that part of the Superior Court decision which reverses the Board's findings, and the remedies dependent thereon, with respect to the employees' date of permanent hire. We deny the plaintiff's appeal and sustain the defendants' cross-appeals.

The City of Bangor hires operations and maintenance employees as permanent, full-time employees or as seasonal laborers. Under the Maine Municipal Public Employees Labor Relations Law, 26 M.R.S.A. §§ 961–972 (1974), "public" employees have the right to join labor organizations. Employees who have been employed for less than six months or who are temporary, seasonal or on-call employees, are not considered "public employees" and therefore do not have a protected right to join unions, are not members of any bargaining unit and thus do not receive the wages and benefits of a unionized employee. *See* 26 M.R.S.A. § 962(6)(F) and (G). Operations and maintenance employees are represented by the defendant in this case, AFSCME.

By 1976, the city had begun hiring under the title of "seasonal laborer" persons who in fact worked on a full-time, permanent basis. At the same time, the number of full-time, permanent workers in the bargaining unit was declining, from nearly 90 employees in the period between 1974 and 1976 to approximately 74 employees between 1977 and 1978. These changes in the character of the workforce prompted two members of the union to speak to their union representative, Ross Ferrell, about the status of the seasonal employees. Ferrell subsequently met with the union steward and secretary and three seasonal employees who then decided to file a grievance contending that they should have been included in the unit.[1]

The city's Personnel Labor Relations Director, Jack Perry, testified that he then informed Ferrell that the employees would be fired if the grievance were pursued. The employees decided to go forward with their complaint and were fired in October of 1978. Perry subsequently explained the reason for these discharges:

> Principally I had had it up to my neck with Ross Ferrell in filing grievances that people weren't filing. I'll tell you frankly that that happened in a couple of cases that went before the Maine Board of Arbitration since that period. And he filed a grievance on these guys relative to benefits that they should be receiving. So I just called Hank [the Director of Operations and Maintenance] and I said "To hell with this. Let's get rid of this damn problem right here and now."

Perry later met with two of the discharged employees, determined that they had not personally filed the grievance, and decided to rehire them, since he thought "it really was not these guys' fault that they did this, why the hell should I punish them?" The grievance was ultimately deemed non-arbitrable.

Undaunted by the employer's actions, the union soon thereafter filed a petition for unit clarification with the MLRB.[2] On October 17, 1979, the Board decided that it could not "permit those who exceed 6 months duration, who are in fact permanent employees, and who thus are eligible for public employee status per 26 M.R.S.A. § 962(6)(F), to remain outside of an otherwise wall-to-wall unit." Therefore, the Board ordered that " 'temporary' and 'seasonal' employees who are in fact hired on a permanent basis must henceforth be considered part of the unit when they exceed six months of employment as either 'laborers' or as whatever other existing job classification is most appropriate." This decision was not appealed.

1. The grievance was actually filed by the union on the employees' behalf.

2. The statute describing the conditions under which a petition may be brought states that "any public employer or any recognized or certified bargaining agent may file" the petition. Therefore, the union, rather than the seasonal employees, brought the petition. 26 M.R.S.A. § 966(3) (Supp. 1981).

The city received the Board's decision on the unit clarification petition on October 19, 1979. As a result of the Board's decision, the city personnel director called a meeting of all the seasonal employees on October 26, 1979, and informed them that they were terminated as of that date. The union brought a grievance against the city, but the arbitrators determined that they had no jurisdiction over this particular controversy. The union therefore filed a prohibited practices complaint with the MLRB on April 25, 1980, alleging that the city and its personnel director, John Perry, had unlawfully discharged certain employees, failed to provide the employees with the rights and benefits to which they were entitled under the collective bargaining agreement, and otherwise committed prohibited acts. Hearings were held before the MLRB on June 20, 1980, and July 3, 1980, in Bangor. The Board was warranted in finding the following facts.

On October 19, 1979, Randy Henderson, a seasonal laborer who had been employed for more than six months, was told that he had been fired. He testified at the hearing that when he went to discuss his termination with the Personnel Director, "He just had a list of names from a piece of paper, and he said that—something about the union's got a thing out that after six months if there is no permanent position you just can't stay here." When Henderson reapplied for his job in March 1980, and asked Perry whether the labor dispute would have any effect on whether he would be hired, Perry responded that "it didn't look good." Henderson then asked his former work supervisor whether there would be a job for him. After checking with management, the supervisor told Henderson that only new employees could be hired. At least six people subsequently were hired in the job category for which Henderson applied. The Board found that the refusal to rehire Henderson was "because of the City's desire to keep Henderson out of the unit and its general antiunion animus,"[3] which rendered the city's action violative of 26 M.R.S.A. § 964(1)(A) and (B).

One week after Henderson was discharged, the meeting between the personnel director and the seasonal employees occurred. Perry told the workers that "because of the decision by the Labor Board we are now out of the year round temporary or seasonal work." When one of the employees asked him what would have happened if the union had not filed the unit clarification petition, Perry responded "if the Union hadn't filed the unit determination, you would probably still be here. We would be running as we would before." Perry testified at the hearing that he understood the Board's decision to mean that anyone who had been employed by the City for six months *after* the decision was rendered would become a permanent employee. The Board found that four of those fired at the meeting had been permanent employees on October 26, 1979, and were thus entitled to be members of the bargaining unit.[4] The Board determined that the discharges were motivated solely by the employees' efforts to be included in the unit, and were therefore unlawful.

Perry contended that he fired all the seasonal people because the city had no "budgeted permanent positions available." However, since the firing, two permanent positions had opened; one was filled by an employee who had been fired. Perry had also re-hired two of the discharged employees, on advice of counsel, as permanent employees. A new category of jobs, "on-call", which was apparently similar to the

---

**3.** The Union had also alleged that Henderson was unlawfully discharged. This allegation was determined by the Board to be time-barred under 26 M.R.S.A. § 968(5)(B). Neither of the cross-appellants has challenged this ruling.

**4.** These employees worked during the following periods of time: Jeffrey Bragg: hired 4/19/77, fired 10/26/79; Emery Strout: hired 6/12/78, fired 10/26/79; Lawrence Prescott: hired 11/14/78, laid off 3/23/79, resumed work 5/1/79, fired 10/26/79; Allen Standley: hired 2/1/79, laid off 3/23/79, resumed work 5/1/79, fired 10/26/79. The Board found that they had been permanently hired on these dates: Bragg—4/19/77; Strout—6/12/78; Prescott—5/1/79; Standley—5/1/79.

seasonal positions, was created. Twenty people were hired for the winter of 1979–80 as on-call employees. None of the people hired as on-call employees were paid union wages or benefits. At least twelve more seasonal laborers were hired in the spring of 1980.

Based on these facts, the Board found that the city had violated 26 M.R.S.A. § 964(1)(A) and (B) by 1. discharging solely because of their protected activity four employees who were members of the unit as of October 26, 1979; 2. failing to accord the four employees all the rights, benefits, and working conditions which other members of the unit were receiving; and 3. refusing to rehire Henderson. The Board also found that the city had failed to notify and bargain with the union before discharging the employees, as is required by 26 M.R.S.A. § 964(1)(E).[5] The Board held that the city was obligated to bargain over the *effects* of the discharge (i.e., severance pay, vacation pay, insurance, re-call, etc.). Back pay and reinstatement, among other things, were ordered to remedy the employees' injuries.

The city appealed to the Superior Court from the Board's order, alleging numerous errors. The Superior Court substantially affirmed the Board's findings of violations of 26 M.R.S.A. §§ 964(1)(A), (B), and (E). However, the court found that the Board had improperly ordered that back pay and other benefits for the aggrieved employees were to be computed "according to each employees' true date of permanent hire," since the court had determined that the city had not acted improperly in failing to accord the employees full benefits as of their original date of hire. The court held that the city had reasonably interpreted the unit determination decision as not requiring payment of benefits for the period prior to the

date the decision was rendered. The Board's order was therefore reversed with respect to one of the findings of a violation of section 964(1)(A) and (B) and was modified to require that back pay and other benefits for all five employees be computed from October 19, 1979, the day the city was notified of the Board's decision.

On appeal to this Court, the city has alleged as error 1) the application by the Superior Court of the "in part" test for determining lawfulness of a discharge, 2) the court's conclusion that the city was in fact obligated to notify and bargain with the union concerning the effects of the discharge, and 3) the court's finding that the city did not suffer prejudice as a result of Gary Thorne's participation on the MLRB as an alternate chairperson at the same time that he represented the Teamster's Union in *Baker Bus Co. v. Maine Labor Relations Board*, Me., 428 A.2d 55 (1981). The union and the Board challenge the court's modification of the Board's remedial order.

## I. Unlawful Discharge

The Superior Court, in determining whether substantial evidence existed in the record to support the Board's decision, applied what is loosely termed the "in part" test. Under this test, the discharges in this case were held unlawful because they were motivated at least *in part* by the unit clarification decision. The city contends that the discharges were unlawful only if the Board could have found that the discharge would not have occurred in the absence of the protected activity.

▬▬ We review the decision of the Board rather than the Superior Court, where the court did not receive any evi-

---

**5.** Section 964 reads in pertinent part:

§ 964. *Prohibited acts of public employers, public employees and public employee organizations.*

1. Public employer prohibitions. Public employers, their representatives and their agents are prohibited from:

A. Interfering with, restraining or coercing employees in the exercise of the rights guaranteed in section 963;

B. Encouraging or discouraging membership in any employee organization by discrimination in regard to hire or tenure of employment or any term or condition of employment;

. . .

E. Refusing to bargain collectively with the bargaining agent of its employees . . . .

dence other than what was presented to the Board. *Driscoll v. Gheewalla,* Me., 441 A.2d 1023 (1982). Therefore, on appeal this court is limited to reviewing for clear error the Board's finding "that the discharges were entirely motivated by the employee's efforts to be included in the bargaining unit." *See* 26 M.R.S.A. § 968(5)(F)(1981); *Baker Bus Service v. Keith,* Me., 428 A.2d 55 (1981). Since we find that there exists substantial evidence in the record to support this finding, we need not address plaintiff's concern with the Superior Court's application of the "in part" test. *Baker Bus Service v. Keith,* Me., 428 A.2d 55, 56 (1982) (Court had no occasion to choose between the "in part" and "dominant motive" tests where the Board's finding that interference with union activity was "significant reason" for discharge was not clearly erroneous.)

The only reasonable conclusion which the Board could have drawn from this record was that the city's motive for firing the seasonal workers was to avoid having additional permanent employees on the payroll who would have to be paid union wages and benefits. The Personnel Director himself said that if the union (and some city employees) had not taken action the laborers would not have lost their jobs. The city's conduct seems to us to constitute the most egregious form of unlawful labor practice sought to be prevented by the Maine Municipal Public Labor Relations Law: discharge because of the employees' attempts to obtain the benefits of membership in the labor organization. The Board was unquestionably justified in finding that the city violated section 964(1)(A) and (B) by discharging these employees. *See, e.g., Century Printing Co.,* 242 N.L.R.B. 659 (1979), *Flasco Mfg. Co.,* 162 N.L.R.B. 611 (1967). We find no evidence in the record to support the employer's belated claim that "business necessity" was. the motive for the discharge. In fact, there is evidence indicating that some permanent positions were available and that funds existed to hire other employees to do the work which these employees had been performing.

## II. Refusal to Rehire Henderson

■ Randy Henderson had been employed by the city for more than six consecutive months at the time he was fired (October 19, 1979). He testified at the hearing that when he sought another position with the city, Perry told him that "it doesn't look good because of the labor dispute." Several days later Henderson's former foreman told him that "he couldn't hire me back at all. They have to have a new crew." At least six new workers were hired into Henderson's former workgroup between April 21, 1980, and May 16, 1980.

The Board found that by failing to rehire Henderson the city interfered with, restrained, or coerced him in the exercise of his rights (26 M.R.S.A. § 964(1)(A)) and discouraged membership in the union by discriminating against him (26 M.R.S.A. § 964(1)(B)). The Board determined that Henderson was not rehired because the city did not want him to become part of the unit. Substantial evidence exists to support this finding on which the Board's decision that the city committed a prohibited practice is based. We find no reversible error.

## III. Failure to Bargain

■ The Superior Court determined that the Board's finding of a violation of the duty to notify and bargain with the union was not clearly erroneous. We agree with the Superior Court that the Board did not err in concluding that the city had violated section 964(1)(E) and adopt its accurate analysis of this issue:

The Board found that the City committed a distinct violation of the Public Employees Act when it failed to notify the Union of and bargain with it over the effect of the discharges of Prescott, Strout and Bragg. At issue is section 964(1)(E) which prohibits an employer from refusing to bargain collectively pursuant to § 965, which, in turn, creates an obligation to "confer and negotiate in good faith with respect to wages, hours, [and] working conditions . . . ." The effects of a discharge have been held to be a subject of mandatory bargaining. *N.L. R.B. v. Allis-Chalmers Corp.,* 601 F.2d

870, 875 (5th Cir. 1979); *N.L.R.B. v. W. R. Grace & Co., Construction Products Div.,* 571 F.2d 279, 283 (5th Cir. 1978); *N.L. R.B. v. Transmarine Navigation Corp.,* 380 F.2d 933, (9th Cir. 1967). Concomitant with the characterization of a subject as within the duty to negotiate is a duty of the employer to notify the union to provide it with an opportunity to bargain over it. *Id.* The failure to do so violates § 964(1)(E). In the case of a discharged employee, the subjects of bargaining may include severance pay, vacation pay, seniority, and pensions. *Transmarine, supra.* Here, the City provided no notice to the Union of its decision to discharge the four employees covered by the guaranties of the Public Employees Act. Its unilateral action taken before the Union had an opportunity to negotiate these subjects thus constituted a breach of the Act's provisions.

Article 33(2) of the collective bargaining agreement provides that the City and the Union each "voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to negotiate with respect to any subject or matter referred to or covered in this agreement . . . ." The contract in article 26(1) also provides that "the City shall have the exclusive right to . . . discharge or suspend for just cause . . . [and] to reduce or expand the working forces . . . ." Thus, while article 33(2) effects a waiver by the Union of its right to negotiate over a discharge for just cause itself and over changes in the size of the group of employees, it does not waive its right to negotiate over the *effects* of that discharge. The issues of discharge and its effects are distinct, and the waiver of one is not equivalent to the waiver of the other. The distinctiveness of these two issues is made clear in *Transmarine, supra,* which held that although the managerial decision to terminate its business and reinvest its capital elsewhere is not a subject of collective bargaining, the effects of the decision is mandatory to the extent that it implicates wages, hours, and other conditions of employment. Be-

cause the decision to displace employees and the effects of their displacement are separate and independent issues, and further because waiver clauses in collective bargaining agreements are read constrictively, *N.L.R.B. v. Auto Crane Co.,* 536 F.2d 310, 312 (10th Cir. 1976), *see, e.g., State v. Maine Labor Relations Board, supra,* 413 A.2d at 515, the Board did not err in concluding that the waiver provision in article 33(2) of the collective bargaining agreement did not encompass the effects of discharge. As the effects of a discharge is a subject of mandatory bargaining and because it was not waived here, the City violated § 964(1)(E) by discharging the four employees without first notifying the Union to provide it with an opportunity to request negotiations over its effects.

We find that the Board committed no reversible error in deciding that the city violated section 964(1)(E) and so we deny plaintiff's appeal on this issue.

### IV. Failure to Treat Employees as Members of the Unit

■ The Board found that as a result of the unit clarification decision the city was obligated to treat the four employees who were fired on October 26, 1979, as permanent employees. Instead of doing so, the city fired them. The Board further found that, when two of the four employees were rehired they were not afforded the benefits and wages to which they were entitled as members of the unit. Each received the salary of a new permanent employee and was placed at the bottom of the seniority list, contrary to the provisions of the collective bargaining agreement which detailed the appropriate pay scale for employees based on duration of employment and subject to a performance rating and a recommendation from the Operations Maintenance Director. According to the Board, this action was a violation of section 964(1)(A) and (B) because the unit clarification decision required the city to provide retroactive benefits to the four employees since they had been employed for more than six months.

The Superior Court, in reviewing this decision of the Board, determined that the unit clarification decision was not nearly as expansive as the Board had concluded in the prohibited practice case. The court held that the decision did not require the city to award back pay and benefits based on the date of original hire and that the city therefore had not committed a prohibited practice by failing to treat the employees as if they had been members of the unit prior to the date the decision was received by the city, October 19, 1979.

The appellees, the AFSCME and the MLRB, have cross-appealed from this part of the Superior Court decision, claiming that the court misconstrued the Board's decision. The appellees further argue that since in a unit clarification case the Board has no power to order back pay, reinstatement, or retroactive benefits, the court's reliance on the absence of such a remedial order as authority for finding that there was no violation was entirely unfounded.

We disagree with the Superior Court's analysis of the Board's decision on this section 964(1)(A) and (B) violation. Even assuming that the court's interpretation of the unit clarification decision was correct, the Board's finding of a violation still stands since the city was obligated to treat these employees as members of the unit as of October 19, 1979 and failed to do so. Whether the city should have provided the employees with benefits as of their original date of permanent hire or as of October 19, 1979, is irrelevant in deciding whether a violation occurred since under either scenario the city should have provided all four employees with union benefits. We find that the Superior Court erred in reversing the Board's finding that the city had violated section 964(1)(A) and (B) by failing to treat the seasonal laborers who had been employed for more than six months as members of the bargaining unit.

### V.

As a remedy for the city's several violations of the state labor laws, the Board

ordered, among other things, that back pay and benefits be provided to the five employees in question in amounts computed as of their true date of permanent hire.[6] The city challenged this order, and the Superior Court modified it so that back pay and benefits would be calculated only for the period after October 19, 1979. The court's order reflected its determination that the city had not violated 26 M.R.S.A. § 964(1)(A) and (B) because the unit clarification decision did not require the city to award back pay and benefits based on the date of original hire. Since we have concluded that the court erred in finding that there had been no violation, the court's modification of the order remedying the effects of such a violation can no longer stand.

■ The Board is statutorily empowered to "take such affirmative action, including reinstatement of employees with or without back pay, as will effectuate the policies of this chapter" once it has determined that a party has engaged in a prohibited practice. 26 M.R.S.A. § 968(5)(C). "A properly designed remedial order seeks 'a restoration of the situation, as nearly as possible, to that which would have obtained' but for the unfair labor practice." *Caribou School Dep't v. Caribou Teachers Ass'n,* Me., 402 A.2d 1279, 1284 (1979), *quoting Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). The Board has broad discretion in fashioning appropriate relief for the employer's prohibited practices, and this Court will not "interfere with the remedy chosen by the Board where the reasons articulated for it in the Board's decision clearly show it to be within the statutory powers of the Board." *M.S.A.D. No. 43 Teachers' Ass'n v. M.S.A.D. No. 43 Bd. of Directors,* Me., 432 A.2d 395, 398 (1981).

The Board ruled that the city was required to "make these employees . . . whole for any loss of earnings and other benefits caused by the city's unlawful actions." Ac-

---

**6.** The date for each employee was determined to be: Henderson: April 9, 1977; Bragg—April 19, 1978; Strout—June 12, 1977; Prescott and Standley—May 1, 1979.

cording to the Board, this order was necessary to effectuate the policies of the labor laws. In ordering that back pay be computed as if each worker had received favorable performance ratings and the required recommendation from the Operation Maintenance Director, the Board reasoned "[b]ecause the city has not treated these employees fairly in the past, we believe it would not be fair or proper to require that the amount of back pay due be dependent upon a performance rating and recommendation by management."

■■■ We find that the Board has not abused its discretion in ordering that back pay and benefits be computed as of each employee's true date of permanent hire. The Board considered it necessary, in order to make each employee whole, to compensate the workers for the months or years each spent working as a permanent, full-time employee without receiving the benefits due to a permanent, full-time employee. We cannot say that the Board abused its discretion nor that it exceeded the scope of its statutory authority in fashioning the remedies it ordered in this case. We therefore reverse the Superior Court judgment modifying part of the remedial order of the Board.

### VI. Board Prejudice

■■■ Gary Thorne served in this prohibited practices case as the alternate chairperson and public representative to the Board. Subsequent to the issuance of the Board's decision, the city discovered that Thorne had appeared as counsel for the Teamsters Union in a case which raised the question of whether the "in part" test or the "dominant motive" test should be adopted in Maine. The union in that case advocated adherence to the "in part" test, but the city in this case has argued against application of that rule. The Superior Court, after a testimonial hearing, determined that there had been no prejudice to the city as a result of Thorne's participation in the case of *Baker Bus Service v. Keith,* Me., 428 A.2d 55 (1981). The city has appealed from this ruling.

The record establishes that Thorne participated in *Baker Bus* by (1) filing an appearance in Superior Court and (2) allowing his name to be signed to a Law Court brief written and researched by out-of-state counsel for the union. Thorne testified at the hearing that he did not know what issues were involved in the *Baker Bus* case, and had no interest in the case at the time he served on the Board in the instant case.

The city argues that under M.R.Civ.P. 11, Thorne is charged with constructive knowledge of the issues in the Brief. As the appellees note, Rule 11 applies only to pleadings, so this argument is incorrect. Even if it were accurate to charge him with knowledge, the city has not proven that any prejudice would have resulted. The employer also argues, mistakenly, that this case is similar to *Gashgai v. Board of Registration in Medicine,* Me., 390 A.2d 1080 (1978) ("combination [in one person in one case] of investigator, prosecutor and sitting member of the adjudicatory panel, even if ostensibly a nonparticipating member, creates an intolerably high risk of unfairness." *Id.* at 1082). This case is not factually similar to *Gashgai,* since Thorne here participated only as a member of the adjudicatory panel.

The rule in Maine is that pecuniary interest or relationship is a ground for disqualifying a judge. *Hughes v. Black,* 156 Me. 69, 160 A.2d 113 (1960). The interest must be direct and capable of demonstration rather than speculative. *Id.* The city introduced no evidence which would support a finding of prejudice under this standard. Further, the fact that the Board found that the discharges were "entirely motivated" by anti-union animus renders irrelevant the city's claim that it was prejudiced by Thorne's alleged advocacy of the "in part" test in this case. We affirm the Superior Court decision on this issue.

We affirm the order of the Superior Court in so far as it affirmed the decision of the MLRB. We reverse the court's finding that the city did not violate 26 M.R.S.A. § 964(1)(A) and (B) by failing to treat the four employees as members of the unit and

reinstate the Board's order on this issue. We also conclude that the court's modification of the Board's remedial order is erroneous, and therefore reinstate the Board's order.

The entry is:

Appeal denied. Cross-appeal sustained. Order of Superior Court affirmed in so far as it affirms the decision of the Maine Labor Relations Board, and reversed in so far as it modifies or reverses the decision of the Maine Labor Relations Board.

Remanded to Superior Court for entry of judgment affirming the decision of the Maine Labor Relations Board.

All concurring.