**CARIBOU SCHOOL DEPARTMENT**

v.

**CARIBOU TEACHERS ASSOCIATION
and Maine Labor Relations Board.**

Supreme Judicial Court of Maine.

June 19, 1979.

See also, Me., 402 A.2d 1287.

Ellsworth T. Rundlett, III (orally), Portland, Ferris A. Freme, John D. McElwee, Caribou, for plaintiff.

Sunenblick, Fontaine & Reben by Donald F. Fontaine (orally), Portland, Michael C. Ryan (orally), Maine Labor Relations Board, Wayne Whitney, Jr., Richard L. Hornbeck, Augusta, for defendants.

Before McKUSICK, C. J., POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ., and DUFRESNE, A. R. J.

McKUSICK, Chief Justice.

Caribou Teachers Association (hereafter "Association") appeals from a judgment of the Superior Court (Aroostook County) vacating a decision of the Maine Labor Relations Board finding a violation on the part of the Caribou School Department (hereafter "Department") of the statutory duty to bargain in good faith set forth in 26 M.R.S.A. § 964(1)(E) (1974).[1] The Association maintains that the Superior Court erred in deciding that the Board's decision was without evidentiary support. We agree with the Association, and accordingly sustain the appeal. We find it necessary, however, to modify the relief granted by the Board.

On January 6, 1976, the Association and the Department conducted their first collective bargaining session, seeking a contract to succeed the 1975–76 contract then in effect, which would expire on July 31, 1976. The parties agreed on certain "ground rules" for the upcoming negotiations, including a ground rule providing: "Once the packages for negotiations are exchanged, no other items may be submitted unless mutually agreed." The parties contemplated that if no change in a particular article of the existing 1975–76 contract was proposed by either side at the first exchange of contract proposals, then that article would remain unchanged from the old 1975–76 contract to the successor contract.[2] The purpose of this ground rule was to ensure that the area of disagreement between the two sides would become progressively smaller and that new issues would not later

be raised unilaterally, thus upsetting balances and partial bargains already struck in the negotiating process.

On January 6, 1976, the parties exchanged their initial collective bargaining proposals. Neither side proposed any change in Article XXIXA of the 1975–76 contract. That article, entitled "Duration of Contract," provided in part:

"This agreement shall be effective as of August 1, 1975, and shall continue in effect until July 31, 1976 subject to the Association's right to negotiate over a successor agreement . . . .

"This agreement shall not be extended orally and it is expressly understood that it shall expire on the date indicated."

The failure to propose any change in this article thus resulted in the incorporation of a similar article into the successor contract, providing for a new contract for a one-year period starting August 1, 1976. This one-year contract term was identical to the one-year terms which had characterized the three preceding collective bargaining contracts for 1973–74, 1974–75, and 1975–76. The initial bargaining proposals exchanged by the Association and the Department were both labeled as contract proposals for the year 1976–77.

On March 11, 1976, the Association requested, pursuant to 26 M.R.S.A. § 965(3) (1974), that a factfinding panel be appointed to hear issues in controversy arising from the negotiations. On March 16, 1976, the Department requested that a mediator be assigned pursuant to 26 M.R.S.A. § 965(2) (1974) to attempt to resolve disputed issues. Neither the Department's mediation request nor the Association's factfinding request listed the starting date of the

---

1. 26 M.R.S.A. § 964(1) provides in part: "Public Employers, their representatives and their agents are prohibited from . . . (E) Refusing to bargain collectively with the bargaining agent of its employees as required by section 965." 26 M.R.S.A. § 965 states:

"(1) *Negotiations* It shall be the obligation of the public employer and the bargaining agent to bargain collectively. 'Collective bargaining' means, for the purposes of this chapter, their mutual obligation . . . (C) To

confer and negotiate in good faith with respect to wages, hours, working conditions and contract grievance arbitration . . ."

2. The Department's first item in its initial proposal reflected this understanding, stating that "All articles in the current contract, except as proposed shall remain in effect, except for Articles IVA and XXVI which shall be deleted from the contract."

successor contract as an issue in dispute. Mediation was held on April 7, 1976, and no discussion of the term of the successor contract took place. A factfinding hearing was held on June 4, 1976, and the factfinder's report issued on June 29, 1976, made no mention of the term of the successor contract.

At a negotiation session held on August 9, 1976, over eight months after the commencement of negotiations and nine days after the expiration of the preceding contract, the Department attempted, for the first time, to introduce the issue of the effective date of the successor contract. Citing the ground rule that provided that no issue not raised in the initial bargaining proposals could be raised without the consent of both parties, the Association refused to negotiate on this issue.

On October 6, 1976, the parties participated in interest arbitration. 26 M.R.S.A. § 965(4) (1974). The Department again requested discussion of the term of the successor contract, and the Association again objected, alleging that it was not a proper subject for consideration by the arbitration panel. The panel requested post-hearing materials on the question of whether the effective date of the new contract was properly before the panel. On December 31, 1976, the panel issued its award, which included a rejection of the Department's proposal to discuss the effective date of the new contract. Neither party sought review of the arbitration award as provided for by 26 M.R.S.A. § 972 (1974).

On the ground that the Association had not complied with the 120-day notice requirement of 26 M.R.S.A. § 965(1) (1974), the Department refused to discuss a wage increase throughout the negotiations conducted in 1976. In early 1977, however, the parties agreed for the first time to discuss wages. Concerned that almost half of the 1976–77 school year had already elapsed without the attainment of a collective bargaining contract, the Department agreed to discuss a wage increase in return for the Association's consent to enter into a one and one-half year contract instead of the customary one-year contract. While willing to agree to extend the term of the new contract through July 31, 1978, the Association contended that the effective starting date of the contract had to remain August 1, 1976. The Department, however, contended that the new contract should commence on December 31, 1976, leaving the parties without any contract for the period between August 1 and December 31, 1976.[3]

On February 18, 1977, the parties reached agreement on all issues in dispute save for the issue concerning the effective date of the new contract. A new contract was entered into which contained the following provision:

"*ARTICLE XXXI. Duration of Agreement.* This Agreement shall be effective as of December 31, 1976 and shall continue in effect until July 31, 1978, subject to the Association's right to negotiate over a successor agreement as provided in Article II.*" (Asterisk in original)

At the insistence of the Association, the asterisk at the end of the above-quoted sentence was placed in the contract to refer to a caveat reading:

"With regard to the effective date of this contract, execution of this agreement does not prejudice the Association from seeking a determination relative to retroactivity."

The caveat reserved to the Association the right to test the validity of deferring the

---

3. Assuming that the Association had failed to provide the notice of intent required by section 965(1), and further assuming, without deciding, that the Department was authorized to waive noncompliance with the statutory notice requirement, the Department was free to negotiate concerning a pay raise which could start on any date during the term of the successor contract. But instead of insisting simply on a wage increase effective date of December 31, 1976, the Department insisted that the entire contract not take effect until December 31. Given the negotiation ground rule and the August 1 effective date of the preceding one-year contract, the Department was not entitled to attempt to renegotiate the starting date of the entire collective bargaining contract as long as the Association objected to negotiation on this topic.

start of the new contract until December 31, 1976; in other words, to test the validity of leaving the Caribou teachers and school department without any contract for the last five months of 1976.[4]

Implementing the reservation of rights contained in that caveat, on April 11, 1977, the Association filed, pursuant to 26 M.R. S.A. § 968(5)(B) (1974), a prohibited practices complaint with the Maine Labor Relations Board, alleging that the Department's insistence on a contract starting date different from August 1, 1976, was a violation of the duty to bargain in good faith. 26 M.R. S.A. § 964(1)(E) (1974). After a prehearing conference, two evidentiary hearings, and receipt of briefs from the parties, the Board issued its decision on February 1, 1978, holding that the Department had committed a breach of its duty to bargain in good faith. Having concluded that the Association had not waived its right to object to the contract provision setting December 31, 1976, as the effective date of the contract, the Board—"[t]o remedy the violation"—ordered the Department to "give retroactive effect to the contract executed February 18, 1977 to August 1, 1976" and to "pay any additional wages and benefits due therefrom with legal interest."

The Department then filed a complaint in Superior Court pursuant to 26 M.R.S.A. § 968(5)(F) and Rule 80 B of the Maine Rules of Civil Procedure, seeking judicial review of the Board's decision. On August 3, 1978, the Superior Court entered judgment in favor of the Department, vacating the decision of the Board. The Superior Court stated that the record of the proceedings before the Board was "totally void of any indication of bad faith bargaining" on behalf of the Department. The Board's decision, according to the Superior Court, "[a]mounted to a finding of a *per se* violation" based on the Board's determination that the Department had violated the ground rule against raising new issues after the initial exchange of bargaining proposals without the consent of both parties. The Association then prosecuted this appeal to the Law Court.

■ After a careful review of the record and the Board's decision, we conclude that the Board did not base its finding solely on the fact that the negotiation ground rule had been violated by the Department. Though there is some language in the Board's decision that might create the false impression that the Board applied a *per se* rule equating any violation of a negotiation ground rule with a violation of the duty to bargain in good faith, we find that the Board relied on other evidence of bad faith bargaining as well.[5]

The Board's decision did not rest alone on a technical violation of the negotiation ground rule. Instead, the Board examined that violation in the context of the eight months of collective bargaining negotiations from January 6, 1976, to August 9, 1976, and against a background of a history of collective bargaining contracts between the parties which consistently called for contracts of one year's duration starting on August 1. The plain inference to be drawn from the ground rules and the initial proposal submissions in January 1976, as well as from the subsequent negotiations at least

4. The asterisked caveat cannot be read to enlarge or limit in any way the Maine Labor Relations Board's powers to grant remedial relief to a party aggrieved by a violation of 26 M.R.S.A. § 964(1)(E) (1974). The terms of the caveat did not purport to set forth agreed-upon remedies in the event the Board should later determine that the Department had failed to bargain in good faith. The caveat simply reserved to the Association the opportunity of asserting whatever legal rights it had "with regard to the effective date of this contract." It did not purport to give any substantive legal rights to the Association. As the Board declared in its decision, the caveat merely served the purpose of negating any implication of waiver by the Association: "[The caveat] clearly reserves to the Association the right to a determination of the effective date of the contract without waiving the right by executing the agreement, and we conclude that the execution of the collective bargaining agreement did not waive the Association's right to object under the ground rule."

5. We need not decide, therefore, whether the Board has the authority to promulgate such a *per se* rule concerning the breach of a negotiating ground rule.

until August 9, is that both parties understood that the new contract would begin, as had the existing and prior contracts, on August 1. Neither party proposed, nor reasonably could have had in contemplation, negotiating a new contract that would not commence until some months after the expiration of the existing contract, leaving an hiatus during which neither party would have any contractual protection.

Against that factual background the Department's eight-month delay in raising the issue of the effective date of the new contract and its failure to raise the issue before the factfinding panel or the mediator reasonably led the Association to believe that this issue was settled. The Department's subsequent injection of the issue for the first time is evidence of a lack of good faith bargaining. Under the National Labor Relations Act (29 U.S.C.A. §§ 151 *et seq.*), which is analogous to the state act at issue in this case, such a delay in introducing a contract issue while the other party proceeds under the impression that the issue is settled is evidence of dilatory tactics and bad faith. *Cf. NLRB v. New England Die Casting Co.*, 116 N.L.R.B. 1, *enforcement granted* 242 F.2d 759 (2d Cir. 1957).

In *NLRB v. Altex Mfg. Co.*, 307 F.2d 872 (4th Cir. 1962), the employer and the union agreed on January 12, 1960, that a collective bargaining contract which had previously expired on November 30, 1959, would be renewed and extended through June 30, 1960. They also agreed that negotiations for a successor contract to take effect on July 1, 1960, would be limited to wages and monetary issues, and that all other contract provisions in the preceding contract would remain in force in the successor contract. Negotiations for the successor contract commenced on May 27, 1960, yet it was not until December of 1960 that the employer took the position that all provisions of the successor contract were open for renegotiation. The employer's delay in raising the nonmonetary issues, coupled with the January 12, 1960, agreement to limit negotiations to monetary issues only, was held to constitute sufficient evidence to support a finding that the employer violated his federal statutory duty to bargain in good faith. *Id.* at 874.

Similarly, in another federal case the parties bargained for over seven months for a proposed contract for one year's duration. Then, for the first time, the employer stated that it doubted the union's majority status and suggested that the proposed contract should cover a period of merely seven weeks. In affirming a finding of bad faith bargaining, the Ninth Circuit Court of Appeals opined:

> "This kind of cat and mouse game is not good faith bargaining; it is its exact opposite, a negation of the employer's duty '. . . to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement. . . .'" *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir. 1972).

We find the rationale of *Altex* and *Holmes* applicable in the case at bar. The Board had before it evidence of (1) the Department's belated attempt to raise the issue of the effective date of the contract seven months after the start of collective bargaining; (2) its proffer of an initial bargaining proposal entitled "District Proposal, 1976–77," leading the Association to believe that the customary one-year contract commencing August 1 was contemplated; and (3) its violation of the ground rule for negotiations barring one side from unilaterally raising an issue not raised in the initial bargaining proposal of either party. Taken together, this evidence provided more than adequate support for the Board's finding of a failure to bargain in good faith in violation of 26 M.R.S.A. § 964(1)(E) (1974).

Although we have concluded that the Board was correct in finding a violation of the duty to bargain in good faith, we are unable to affirm that part of the Board's decision which compels the Department to make retroactive payment of wage and benefit increases. This portion of the Board's order exceeds the proper scope of remedial action authorized by 26 M.R.S.A. § 968(5)(C) (1974).

To begin with, the language of section 968(5)(C),[6] used by the Maine legislature in 1971 to prescribe the Board's power to remedy violations of the act, is nearly identical to the comparable provision of the National Labor Relations Act first adopted by Congress in 1935. The Maine statute reads as follows:

"After hearing and argument if, upon a preponderance of the evidence received, the board shall be of the opinion that any party named in the complaint has engaged in or is engaging in any such prohibited practice, then the board shall in writing state its findings of fact and the reasons for its conclusions and shall issue and cause to be served upon such party an order requiring such party to cease and desist from such prohibited practice and *to take such affirmative action*, including reinstatement of employees with or without back pay, *as will effectuate the policies of this chapter.*" (Emphasis added)

The Maine "policies of this chapter," which the Maine Labor Relations Board is authorized to take affirmative action to effectuate, are for present purposes substantially the same as the policies of the federal labor law. *Compare* 26 M.R.S.A. §§ 964(1)(E), 965(1) (1974) *with* 29 U.S.C.A. §§ 158(a)(5), 158(d) (1973).

Since the Maine legislature, in defining the Maine Labor Relations Board's powers to grant relief, chose to employ the same statutory language as that employed by Congress, the legislature must be understood to have intended the Maine Board to have the same powers, and only the same powers, as those given the National Labor Relations Board by the federal act as construed by the federal courts.

▮ The N.L.R.B. is authorized to issue remedial orders once it has found a statutory violation. However, "the power to command affirmative action is remedial, not punitive." *Republic Steel Corp. v. NLRB*, 311 U.S. 7, 12, 61 S.Ct. 77, 79, 85 L.Ed. 6

(1940). *See Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 235, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "[T]he purpose of Board remedies is to rectify the harm done the injured workers, not to provide punitive measures against errant employers." *Local 57, International Ladies Garment Workers v. NLRB*, 126 U.S.App.D.C. 81, 89, 374 F.2d 295, 303, *cert. denied* 387 U.S. 942, 87 S.Ct. 2074, 18 L.Ed.2d 1328 (1967). A properly designed remedial order seeks "a restoration of the situation, as nearly as possible, to that which would have obtained" but for the unfair labor practice. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271 (1941). In enacting section 968(5)(C) the Maine legislature, by taking over the federal statute without any significant change in language, could not have meant to work any change in statutory intendment. Thus our law, like the federal law, contemplates remedial Board orders only and does not authorize punitive orders seeking to deter future violations of the act.

The Maine Labor Relations Board, having found the violation of the Department's duty to bargain in good faith, had then the task of fashioning remedial relief. The Department's violation arose out of its insistence that the whole contract should not go into effect until December 31, 1976, leaving a gap of nearly five months with no operative contract between the parties. The scope of the permissible wage negotiations extended to both the amount and the effective period of any wage increase. The Department was within its rights in limiting the period of time for which it would agree to pay the negotiated wage increase. By signing the February 18, 1977, contract, it agreed to a wage increase of a certain amount contingent upon all other terms of that contract, including a starting date of December 31, 1976. It agreed to nothing more.

In fashioning a remedy, the Maine Labor Relations Board is authorized "to take such

---

**6.** The Maine statute is identical to 29 U.S.C.A. § 160(c) (1973) except that it substitutes the word "party" for the word "person" and the term "prohibited practice" for the term "unfair labor practice."

affirmative action . . . as will effectuate the policies of this chapter." 26 M.R.S.A. § 968(5)(C), *supra*. One of those policies is set forth in 26 M.R.S.A. § 965(1)(C), which provides in part that "neither party shall be compelled to agree to a proposal or be required to make a concession . . ." In nearly identical language the National Labor Relations Board is instructed "to take such affirmative action . . . as will effectuate the policies of this subchapter." 29 U.S.C.A. § 160(c) (1973). Similarly, the obligation to bargain in good faith, under federal law, "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C.A. § 158(d) (1973).

The United States Supreme Court has concluded that the National Labor Relations Board's remedial powers under 29 U.S. C.A. § 160(c) (1973) are limited by the effect of 29 U.S.C.A. § 158(d) (1973). The interplay between 26 M.R.S.A. §§ 968(5)(C) and 965(1)(C) (1976) must be construed in a similar manner. As the United States Supreme Court observed in *H. K. Porter Co. v. NLRB*, 397 U.S. 99, 108, 90 S.Ct. 821, 826, 25 L.Ed.2d 146 (1970):

> "One of [the] fundamental policies [of the National Labor Relations Act] is freedom of contract. . . . [A]llowing the Board to compel agreement when the parties themselves are unable to agree would violate the fundamental premise on which the Act is based—private bargaining under governmental supervision of the procedure alone, *without any official compulsion over the actual terms of the contract.*" (Emphasis added)

In *Porter* the National Labor Relations Board found the employer had violated its duty to bargain in good faith by refusing to discuss the union's request that the contract include an automatic union dues check-off provision. In fashioning a remedy for this violation, the Board ordered the employer to include a union dues check-off clause in the contract. The Supreme Court, however, while approving the finding of a failure to bargain in good faith, set aside that portion of the Board's order directing the employer to include the check-off clause in the collective bargaining contract. The Court noted that the National Labor Relations Act requires the employer to negotiate with respect to such a clause, but it does not require the employer to agree to such a contract provision.

Similarly, in *Winn-Dixie Stores, Inc. v. NLRB*, 567 F.2d 1343, 1351 (5th Cir. 1978), the Court stated:

> "Even though the company did violate its duty to bargain by refusing to discuss the possibility of [including the employees in] the company's profit-sharing/retirement plan, *we are unable to enforce that part of the Board's order which requires the company to create [profit-sharing] accounts for those employees . . . .* The Board justifies this remedy as an effort to recreate the status quo ante existing before the adoption of the [successor] contract. It obviously does not. . . . The board order creates a status novus which would exist only if the employees had succeeded in getting . . coverage under . . . the company's profit-sharing/retirement plan . . . .
>
> "Even though the company violated the Act, there is no way to evaluate, or even to identify, the harm flowing to the employees as a result of that violation. . .
>
> "Of course, *the Board cannot fashion remedies on the basis of an assumption as to what the parties would have agreed to absent an employer's failure to bargain in good faith.*" (Emphasis added)

*Accord Ex-Cell-O Corp.*, 185 N.L.R.B. 107 (1970), *enf'd as modified sub nom. International Union, U.A., A. & A.I. Workers v. NLRB*, 145 U.S.App.D.C. 384, 449 F.2d 1046 (1971).

Applying this clearly applicable law to the circumstances of the present case, we find no difficulty in concluding that the Maine Labor Relations Board exceeded its powers in imposing upon the Caribou School Department against its will the duty of paying a wage increase during the last five months of 1976. The Department had nev-

er, directly or indirectly, agreed to any change in wages to become effective at any date earlier than December 31, 1976. Even though the Board correctly found that the Department violated the Act by failing to bargain in good faith, there is, in the above-quoted words of the Fifth Circuit in the *Winn-Dixie* case, *supra*, "no way to evaluate, or even to identify, the harm flowing to the employees as a result of that violation." Neither the Board nor this court can speculate "as to what the parties would have agreed to [relative to a wage increase] absent [the] employer's failure to bargain in good faith." *Id.*

The Department and the Association had, prior to their February 18, 1977, contract, arrived at a partial agreement to the effect (1) that the new contract would start on August 1, 1976, and (2) that undisputed contract terms would be taken over unchanged into the new contract. That is as far as the parties had agreed prior to February 18, 1977. That partial agreement arose out of their negotiation ground rule adopted in January 1976 and their exchange of negotiating proposals pursuant to the ground rule. In subject matter that partial agreement was strictly limited to the start-ing date and duration of the new contract and the carry-over of the unchanged provisions of the old contract.[7] Any changed provisions of the new contract, including any increase in wages and the date any increase should go into effect, was left to be negotiated. They remained contingent upon either a meeting of minds between the negotiating parties or a binding decision in interest arbitration.[8] There simply never was any meeting of minds on any wage increase to go into effect prior to December 31, 1976; and the wage increase could never be the subject of binding arbitration. The Board ordered the Department involuntarily to pay the increased wages for a period during which the Department never agreed to pay.

Thus, even though we affirm the Maine Labor Relations Board's decision that the Department violated section 964(1)(E), we find it necessary to modify the Board's order. The operation of the ground rules for negotiation, together with the parties' initial bargaining proposals exchanged on January 6, 1976, resulted in a partial agreement binding the parties to incorporate several terms of the preceding 1975–76 contract into the successor contract, which took

---

7. We reject any notion that the Department in January 1976 bound itself to pay any negotiated wage increase from August 1, 1976, regardless of the fact that the Department contracted to pay the increase in February 1977 only as part of a total package providing, *inter alia*, for extension of the new contract for an additional year and start of the wage increase and other changes on December 31, 1976. The Board did not find that any such broader agreement arose from the January 1976 transactions between the parties, but rather—after finding the Department by introducing a new subject on August 9, 1976, had violated section 964(1)(E)—ordered the Department to pay the wage increase retroactively, in order "[t]o remedy the violation." The record, in our judgment, would not support any broader construction of the parties' January 1976 agreement than that found by the Board.

8. Where the parties fail to reach an agreement on subjects of negotiation, the legislature has provided a statutory mechanism for resolving disagreement by submitting disputes to binding or advisory interest arbitration. 26 M.R.S.A. § 965(4) (1974) states that: "With respect to a controversy over *salaries, pensions and insurance,* the arbitrators will *recommend terms of settlement* and may make findings of fact; such *recommendations* and findings *will be advisory only* . . . .; with respect to a controversy over *subjects other than salaries, pensions and insurance,* the arbitrators shall make determinations with respect thereto . . . and if made by a majority of the arbitrators, such *determinations will be binding on both parties* and the parties will enter an agreement or take whatever other action that may be appropriate to carry out and effectuate such binding determinations . . . .." (Emphasis added) Thus, except for disputes over salaries, pensions, and insurance, a decision of the majority of a panel of arbitrators may be substituted for a meeting of the minds between the negotiating parties. In the case at bar, however, the interest arbitrators were powerless to mandate a wage increase. The Board's order requiring a wage increase for a period prior to December 31, 1976 (the date agreed upon by the Department), cannot be predicated upon a decision of the interest arbitration panel.

effect on August 1, 1976.[9] Also, both parties were bound by all those terms involving matters other than "salaries, pensions and insurance" that the interest arbitrators had mandated to be effective starting August 1, 1976. All those terms binding upon the parties either by the January 1976 partial agreement or by the interest arbitration might be enforced by a remedial order of the Maine Labor Relations Board. *Cf. Taft Broadcasting Co. v. NLRB,* 441 F.2d 1382 (8th Cir. 1971).[10] The Board, by going beyond that point and ordering a wage increase retroactively to August 1, 1976, was making a contract for the parties and was mandating a contract term that even the interest arbitrators were forbidden to impose upon the parties. Such an order was not "remedial" relief within the authority of the Board.

We therefore remand and direct the Superior Court to enter an order of the following tenor:

"It is hereby ordered that:

(1) that portion of the Maine Labor Relations Board's decision finding a violation of the duty to bargain in good faith by Caribou School Department is affirmed;

(2) that portion of the Board's order requiring Caribou School Department to pay retroactive wage and benefit increases for the period from August 1, 1976, to December 31, 1976, is reversed and vacated;

(3) the Board's decision is modified to declare that the parties from August 1, 1976, to December 31, 1976, were bound by all those provisions of their 1975–76 contract that were not put in issue by either party in its collective bargaining proposal of January 6, 1976; and

(4) the parties were bound for the same period by all determinations made by a majority of the interest arbitrators, except for determinations made concerning teachers, salaries, pensions or insurance."

The entry must be:

Appeal sustained.

Judgment of the Superior Court set aside.

Case remanded to the Superior Court for entry of an order as directed in this opinion.

Costs on appeal allowed to neither party.

WERNICK, J., did not sit.

DUFRESNE, A. R. J., sat by assignment.

---

9. Although we cannot affirm that portion of the Board's order which grants the Association a retroactive wage increase as of August 1, 1976, we are nonetheless granting the Association and its members substantial relief by recognizing the continued effectiveness after August 1 of all those provisions of the 1975–76 contract which both parties under the ground rules had agreed to carry forward without change. As is illustrated by the companion case of *Caribou Board of Education v. Caribou Teachers Association,* Me., 402 A.2d 1287 (1979), also decided today, the existence of contractual provisions, such as those governing grievance arbitration, during the last five months of 1976 are of considerable importance to the teachers.

10. A complete discussion of *Taft* may be found in the companion decision in *Caribou Board of Education v. Caribou Teachers Association,* Me., 402 A.2d 1287 (1979), also decided today.