## MOUNTAIN VALLEY EDUCATION ASSOCIATION

v.

## MAINE SCHOOL ADMINISTRATIVE DISTRICT NO. 43 and Maine Labor Relations Board.

Supreme Judicial Court of Maine.

Argued Nov. 15, 1994.

Decided March 2, 1995.

Shawn C. Keenan (orally), Maine Educ. Ass'n, Augusta, for plaintiff.

Harry R. Pringle (orally), Drummond, Woodsum, Plimpton & MacMahon, Portland, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, DANA, and LIPEZ, JJ.

WATHEN, Chief Justice.

Mountain Valley Education Association ("the Association") appeals from a judgment entered in the Superior Court (Kennebec County, *Alexander, J.*) affirming a decision of the Maine Labor Relations Board ("the Board") upholding Maine School Administrative District No. 43's ("SAD 43") unilateral implementation of its last best offer on wages and insurance. The principal issues on appeal are whether the Municipal Public Employees Labor Relations Law ("the Act"), 26 M.R.S.A. §§ 961–974 (1988 & Supp.1994), permits unilateral implementation of a public employer's last best offer following an impasse in bargaining and whether the Board's finding of impasse is clearly erroneous. We affirm the judgment of the Superior Court.

The facts as found by the Board may be briefly summarized as follows: The Association and SAD 43 began negotiations in June 1990 for an initial contract for the benefit of a combined unit of teacher aides and assistants.[1] The negotiations were long and arduous, with the parties participating in three mediation sessions and in factfinding. Thereafter, the parties submitted several issues including wages, health insurance, and

---

1. The combined bargaining unit came about after the Rumford School Department joined the Mexico schools in SAD 43. At the time of the merger, the combined group of aides and the combined group of assistants each decided which of the pre-existing wage and benefit packages would apply pending negotiation of a new collective bargaining agreement. The aides selected the lower pay and paid health insurance that had prevailed in Mexico, and the assistants chose the higher pay without health insurance that had prevailed in Rumford.

duration of the contract to arbitration. Following a hearing, the arbitration panel issued a report on July 9, 1992 making non-binding recommendations on wages, retirement payment, and health insurance, but imposing a two-year duration of contract for the school years 1991–92 and 1992–93.

In September of 1992, SAD 43 sent a proposal on wages and insurance to the Association. The terms were an improvement over those previously proposed by SAD 43 but not in complete accord with the arbitrators' recommendations. The parties met, but the Association rejected the offer and made counterproposals. In November of 1992, SAD 43 notified the Association of its last best offer on wages and insurance. The Association immediately filed for mediation. SAD 43 thereafter implemented its wage and insurance proposals.[2]

The Association filed a prohibited practice complaint with the Board alleging that SAD 43 violated the Act by unilaterally implementing its proposal on wages and insurance and by failing to observe the arbitrators' binding determination on the duration of the agreement. The Board ruled that SAD 43 committed no violation of the Act by unilaterally imposing its wage and insurance proposals. It held that SAD 43 did violate the Act by refusing to implement the binding arbitration award on the duration of the agreement. The Association, pursuant to 26 M.R.S.A. § 968(5)(F), filed a petition for review of final agency action. The Superior Court affirmed the Board's order. The Association now appeals.

### I. *Unilateral Implementation of Last Best Offer Following Impasse*

We review the Board's decision directly, *State v. Maine State Employees Ass'n,* 538 A.2d 755, 757 (Me.1988), for error of law, abuse of discretion, or clear error. *See City of Bangor v. American Fed'n of State, City, & Mun. Employees,* 449 A.2d 1129, 1134, 1136–37 (Me.1982); 26 M.R.S.A. § 968(5)(F). As the agency charged with enforcement, we accord the Board considerable deference in construing the Act. *Lundrigan v. Maine Labor Relations Bd.,* 482 A.2d 834, 836 (Me.1984). The Board's findings on questions of fact are final unless clearly erroneous. 26 M.R.S.A. § 968(5)(F).

Maine law as well as federal law imposes the obligation to bargain in good faith as part of the statutory definition of collective bargaining. 26 M.R.S.A. § 965(1)(C); 29 U.S.C.A. § 158(d) (1973 & Supp.1994). The National Labor Relations Act (NLRA) requires employers and employees' representatives in the private sector to bargain in good faith with respect to the mandatory subjects of bargaining; namely, "wages, hours, and other terms and conditions of employment." 29 U.S.C.A. § 158(d). In order to support the bargaining process and prevent it from being circumvented or disparaged, federal law has long been interpreted to prevent either party from unilaterally changing wages, hours or working conditions. *See Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 198, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991); *NLRB v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111–12, 8 L.Ed.2d 230 (1962); *NLRB v. McClatchy Newspapers, Inc.,* 964 F.2d 1153, 1157, 1161–62 (D.C.Cir.1992). Thus, while bargaining, and before impasse, a private employer is prevented from "going over the head" of the bargaining agent by unilaterally increasing

**2.** The Board's summary of SAD 43's last best offer, in comparison with the arbitrator's recommendation, is as follows:

For aides, [SAD 43] proposed a step increase plan and two across-the-board increases; the first was higher than the arbitrators had recommended, but for a shorter time period (6 months of retroactivity rather than a year). For the second year of the contract, it offered the across-the-board increase that the arbitrators had recommended. For assistants, who had not been on a step increase plan, the employer offered a step increase plan retroac-

tive for six months, rather than the one year that the arbitrators had recommended. The employer did not accept the recommendation for an across-the-board increase for the second year, but offered a 2 percent raise for any assistant not eligible for a step increase. While it did not adopt the arbitrators' recommendation on health insurance, it did make some changes in its previous offer. It increased the caps (premium amounts to be paid by the employer) for single and two-person coverage (but reduced the cap for family coverage); and it offered to contribute to a higher-coverage plan than it had offered previously.

or decreasing wages. The parties are required to maintain the *status quo* while bargaining, and this principle applies both to negotiations before an initial contract and to post-expiration negotiations for a new contract. *See Litton Fin.*, 501 U.S. at 198, 111 S.Ct. at 2221. Here, in Maine, the Board adopted the rule against unilateral changes with respect to public sector bargaining, *see, e.g., Easton Teachers Ass'n v. Easton Sch. Comm.*, No. 79–14, at 3–5 (Me.L.R.B. March 13, 1979), and we have upheld the Board's use of this rule, *see Lane v. Board of Dir. of Me. Sch. Admin. Dist. No. 8*, 447 A.2d 806, 809–10 (Me.1982); *State v. Maine Labor Relations Bd.*, 413 A.2d 510, 515 (Me.1980).

▆▆ In 1978, the Board adopted from federal labor law the impasse exception to the rule against unilateral change. *Maine State Employees Ass'n v. State*, No. 78–23, at 4 (Me.L.R.B. July 15, 1978), *aff'd sub nom. State v. Maine Labor Relations Bd.*, 413 A.2d 510 (Me.1980). This exception allows a party to unilaterally implement its last best offer when negotiations have reached a *bona fide* impasse.[3] *See Litton*, 501 U.S. at 198, 111 S.Ct. at 2221; *McClatchy Newspapers*, 964 F.2d at 1157, 1164–65; *Easton*, No. 79–14, at 4–5. Once the parties have in good faith exhausted the prospects of reaching an agreement, unilateral change that is reasonably comprehended within the pre-impasse proposals no longer violates the Act. After impasse, however, the duty to bargain is not extinguished. Rather it is temporarily suspended until changed circumstances indicate that the parties are no longer inalterably deadlocked. *See Auburn Firefighters Ass'n Local 797 v. City of Auburn*, No. 89–01, at 23 (Me.L.R.B. March 31, 1989); *see also McClatchy Newspapers*, 964 F.2d at 1164–65.

▆▆ Notwithstanding the similarities with federal law, Maine law differs in at least one respect—impasse cannot occur until specified forms of intervention have been exhausted. Public employees in Maine, unlike employees in the private sector, do not have the right to strike or engage in work stoppages, 26 M.R.S.A. § 964(2)(C). Having eliminated the most common form of impasse resolution procedure, Maine law adds to the definition of good-faith bargaining the obligation to participate in mediation, factfinding, and arbitration procedures. 26 M.R.S.A. § 965(1)(E). These "peaceful" third-party intervention procedures are intended as substitutes for strikes and work stoppages and are designed to provide escalating pressure on both parties to produce a voluntary settlement. *See* Raymond G. McGuire & Bryan M. Dench, *Public Employee Bargaining Under the Maine Municipal Public Employees Labor Relations Law: The First Five Years*, 27 Me.L.Rev. 107–09, 115 (1975). The final step, arbitration, is binding on all issues except the important subjects of wages, insurance, and pensions, for which it is advisory only. 26 M.R.S.A. § 965(4). This diluted form of arbitration brings pressure to bear on the employer, while preserving for public officials the prerogatives of public management, fiscal control, and lawmaking. *See* McGuire & Dench, 27 Me.L.Rev. at 115. In recognition of Maine's unique scheme of statutory procedures,[4] the Board ruled in 1989 that, absent extraordinary circumstances, it would thereafter find an employer's implementation of a last best offer prior to completion of requested impasse resolution procedures to constitute a *per se* violation of the obligation to bargain in good faith. *Auburn Firefighters*, No. 89–01, at 21–24. The issue in the present case is whether, following completion of these procedures, and after impasse, the Act permits an employer to unilaterally impose its last best offer. We find no error in the Board's construction of the statutory duty to bargain in good faith.

▆▆ The Association asked the Board to abandon the impasse exception and argues before us that the Act provides an alternative that is sufficient to resolve any impasse that remains after non-binding arbitration. The Association argues that the statute expressly

---

**3.** Other exceptions to the rule prohibiting unilateral changes are recognized. but these are not relevant to the present discussion. *See Lane*, 447 A.2d 810 n. 2; *Easton*, No. 79–14, at 5.

**4.** The Act's requirement for all three techniques of impasse resolution, although not unprecedented, was not the usual path in public sector labor law when it was enacted. *See* McGuire & Dench, 27 Me.L.Rev. at 108.

provides that the parties may jointly agree to *binding* arbitration even on the subjects of salaries, pensions, and insurance. 26 M.R.S.A. § 965(4). *See Maine Teachers Ass'n v. Sanford Sch. Comm.*, No. 81–55, at 3–5 (Me.L.R.B. Oct. 7, 1981). If the parties refuse this option, the Association contends that they are obliged to continue to negotiate until they reach agreement. In the interim they are required to preserve the *status quo* and are prohibited from making any unilateral change. Even if we recognize that the parties *may* jointly agree to binding arbitration pursuant to section 965(4), and thereby achieve finality, that same section explicitly prohibits compelled binding arbitration for wages, salaries, and insurance. The Legislature imposed the duty to bargain on public employers, but it also granted them the power not to agree. We agree with the Board that in this regard, the balance was premised on a legislative determination that public employers ultimately retain a significant measure of control over their budgets. Typically, public employment budgets require funding by a legislative body. Given the involvement of the public fisc, we agree with the Board that the Legislature neither expressly nor implicitly established the voluntary abdication of the employer's responsibility to control public expenditures as the ultimate solution to an impasse.

■ The Association next argues that a unilateral change, even if made after exhaustion of the statutory procedures, frustrates the Act's policy that "neither side shall be compelled to agree to a proposal or be required to make a concession." 26 M.R.S.A. § 965(1)(C). Along the same lines, the Association contends that if the Board cannot impose wage terms on parties under its remedial authority, *Caribou Sch. Dep't v. Caribou Teachers Ass'n*, 402 A.2d 1279 (Me.1979), neither can SAD 43 impose concessions on its employees without their agreement. Both arguments fail for the same reason. In *Caribou*, we found that the Board, by ordering retroactive payment of wage and benefit increases, was making a contract for the parties, something that it did not have the authority to do. *Id.* at 1285–87. We supported our decision with federal case law holding that the National Labor Relations Board's

remedial powers are limited by the effect of the provision that the obligation to bargain in good faith does not compel either party to agree to a proposal or require the making of a concession. *Id.* at 1285. The Association confuses the making of a contract with the unilateral implementation of a last best offer during a period in which no contract exists. As we explained in *Lane*, the prohibition against unilateral change after expiration of a collective bargaining agreement is not based on contract law, but rather "on the principle that unilateral alterations of the collective bargaining agreement are in contravention of the statutory duty to bargain in good faith." 447 A.2d at 810. The Association has neither been compelled to agree to SAD 43's proposal, nor, by receiving less of an increase than it sought, has it been required to make a concession within the meaning of section 965(1)(C). Rather, the effect of the unilateral increase after impasse is to create a new *status quo* from which the parties must bargain once the duty to bargain is no longer dormant.

■ The Board committed no error in ruling that SAD 43's unilateral implementation of its last best offer following impasse is not a prohibited circumvention or disparagement of the employer's duty to bargain in good faith. Although the Act differs from the National Labor Relations Act in that it prohibits strikes and requires mandatory dispute resolution procedures, the federal impasse doctrine is not thereby rendered inapplicable. The definition of the outer limits of the duty to bargain in good faith requires neither the voluntary abandonment of control of the public fisc, nor bargaining in perpetuity. The Board properly resorted to the impasse doctrine in the present case. Although labor relations in the public sector differ from those in the private sector, there is nothing to suggest that the Legislature intended to reject the impasse doctrine as a *quid pro quo* for the denial of the right to strike. The Board's long-standing reliance on the rule against unilateral change, and the impasse exception to that rule, constitutes a rational adaptation of private sector labor law and serves the goals set forth in the Act.

## II. *Board's Finding of Impasse*

 The Association argues that the Board's finding of impasse is not supported by substantial evidence on the record. The determination of impasse is predominantly a question of fact and therefore will be upheld unless clearly erroneous and unsupported by substantial evidence on the record. *See* 26 M.R.S.A. § 968(5)(F); *Saunders House v. NLRB,* 719 F.2d 683, 687–88 (3d Cir.1983), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2170, 80 L.Ed.2d 554 (1984).

Contrary to the Association's assertions, the Board was not required to make express findings that further negotiations would be fruitless. The parties here had completed mediation, factfinding, and arbitration and there was no question as to good faith during that period. In finding that the parties reached impasse, the Board concluded that SAD 43 participated in further negotiation for a reasonable period of time after receiving the arbitration report. It rejected the Association's argument that SAD 43 violated its duty to bargain in good faith after arbitration by failing to respond to requests to bargain and by implementing its last best offer after it agreed to mediation. We find the Board's findings on impasse to be supported by substantial evidence on the record. Despite the fact that Maine law requires exhaustion of impasse resolution procedures prior to impasse, we agree with the federal courts that "[w]hether a bargaining impasse exists is a matter of judgment." *Taft Broadcasting Co.,* 163 N.L.R.B. 475, 478 (1967), *petition for review denied sub nom. American Fed'n of Television & Radio Artists v. NLRB,* 395 F.2d 622 (D.C.Cir.1968). "[I]n the complex realm of industrial relations 'few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.'" *Saunders House,* 719 F.2d at 688 (quoting *Dallas General Drivers, W. & H., Local No. 745 v. NLRB,* 355 F.2d 842, 844–45 (D.C.Cir.1966)).

---

**5.** SAD 43 did not appeal the Board's decision regarding the duration of the contact provision.

## III. *Violation of Duty to Bargain*

 In its decision, the Board upheld SAD 43's implementation of its last best offer for wages and insurance, but also ordered SAD 43 to implement the binding interest arbitration award of a two-year duration of the contract.[5] The Association contends that the Board should have first remedied SAD 43's refusal to bargain on this particular item and sent the parties back to the bargaining table before ruling on SAD 43's unilateral implementation of its last best offer. The Board has broad discretion to fashion remedies for violations of the Act. *See, e.g., Sanford Highway Unit of Local 481 v. Town of Sanford,* 411 A.2d 1010, 1015–17 (Me.1980). We find no abuse of discretion or error.

The entry is:

Judgment affirmed.

ROBERTS, GLASSMAN, CLIFFORD, RUDMAN and DANA, JJ., concurring.

LIPEZ, Justice, dissenting.

I must respectfully dissent because the Court's decision, in my view, affirms a Board decision which comes perilously close to embracing the statutory impasse concept urged by SAD 43. According to SAD 43, if the parties have exhausted the impasse resolution procedures set forth in 26 M.R.S.A. § 965 and are unable to reach an agreement after continuing efforts at negotiation, they are by definition at a statutory impasse. Although the Board does not explicitly adopt this concept of statutory impasse, it sanctions unilateral action by SAD 43 under circumstances that would normally preclude a finding of impasse. These circumstances include ongoing negotiations that have yielded progress and a violation by SAD 43 of its duty to bargain in good faith during these negotiations. Although a finding that further bargaining would be futile is at the heart of the impasse doctrine,[1] and although the Board made no finding that further negotiations would be fruitless, the Court excuses this

---

**1.** *Alsey Refractories Co.,* 215 N.L.R.B. 146 (1974), *cited in* James W. Heller, *Unilateral Action in a Concession Bargaining Context,* 35 Lab.L.J. 747, 754 (1984).

omission because the parties had completed mediation, fact-finding and arbitration, and had continued negotiations for a reasonable period of time after receiving the arbitration report. These facts describe an ongoing process. They do not describe deadlock.

Given the incompatibility of unilateral action by the employer with the concept of collective bargaining, and given the substantial advantage to the public employer inherent in the right to declare an impasse and unilaterally impose wage and insurance terms, the Court should insist that the Board apply the same rigorous standard to the finding of impasse that the Board applied in such cases as *MSEA v. Bureau of Mental Retardation,* No. 79–43 (Me.L.R.B. Dec. 6, 1979) and *Sanford Firefighters v. Ackerman,* No. 79–62 (Me.L.R.B. Dec. 5, 1979). The Board's application of a diluted impasse standard in this case will have the inevitable effect of compromising the effectiveness of the statutory impasse resolution procedures so critical to the Board's holding in *Auburn Firefighters v. City of Auburn,* No. 89–01 (Me.L.R.B. Mar. 31, 1989) that, absent extraordinary circumstances, the employer's implementation of a last best offer prior to the completion of requested impasse resolution procedures will constitute a *per se* violation of 26 M.R.S.A. § 964(1)(E). The ease of unilateral implementation by the employer after the exhaustion of the statutory impasse resolution procedures will be a disincentive to dispute resolution by the employer during the statutory impasse resolution process. For that reason the diluted impasse standard approved in this case is contrary to the premise of the Municipal Public Employees Labor Relations Law and fundamental tenets of fairness in public sector bargaining.

### Post–Arbitration Negotiations

The arbitrator's report was issued around July 9, 1992. That report made recommendations on wages, insurance and retirement payment, and made binding determinations on all other issues including a two year duration of agreement. The Association informed the superintendent of SAD 43 by letter dated August 17, 1992 that the educational technicians accepted the arbitrator's report by ratifying "their contract as negotiated and arbitrated ..." and requested the Directors' "status concerning the contract." By correspondence dated September 15, 1992, SAD 43 sent to the Association a draft of the proposed collective bargaining agreement and a "last best proposal ..." on wages, medical insurance, sick leave (retirement payment) and duration.

On September 28, 1992, the Association sent a ten day notice to Superintendent Richards to meet and negotiate the non-binding portions of the arbitrator's report. In a letter dated October 1, 1992, SAD 43 confirmed the date for a meeting between the parties. On October 13, 1992, the parties met to discuss the draft of the proposed contract and to discuss the Directors' "last best offer." The Directors did not make any firm proposals, but the Association made some counterproposals and the retirement payment issue was resolved. The Association also made several corrections and additions to the draft of the tentative agreement. Although the Association did not agree to SAD 43's last best proposal, the Association made a counterproposal which the negotiating team for SAD 43 agreed to present to the entire Board of the District. At the October 13, 1992 meeting the Association also informed SAD 43 that the duration of agreement was a binding determination.

After difficult and protracted negotiations that had begun in June 1990, most of the issues between the parties had been resolved at this juncture in October 1992. On the critical issues of health insurance and wages, the differences between the two parties were as follows:

*Association*: Blue Cross Blue Shield Major Medical UCR would be printed into the contract and paid at 100% for current enrollees, paid at 100% of the individual premium for new enrollee; grandfather current "double dippers" on medical insurance and SAD 43's language for all new enrollees on "double dippers."

*SAD 43*: Maine School Management Association Health Insurance Trust Plan III or a comparable plan, no "double dipping," selection of a better plan or additional family coverage at employee's expense;

implement a section 125 to pay the premium difference; Board would contribute $144.12 per month for the individual coverage, $324.29 per month for 2 person coverage and $394.91 per month for family coverage; new enrollees $144.12 per month.

*Association* : Salary effective July 1, 1991—June 30, 1992, year 1 and .10 per hour more than SAD 43's proposal for year two.

*SAD 43:* Salary effective January 1, 1992—June 30, 1992, year 1 and .10 per hour less than the Association's proposal for year two.

By letter dated November 3, 1992, SAD 43 modified somewhat its last best proposal on health insurance by increasing the amounts the District would contribute for various coverages. At the same time, SAD 43 notified the Association that it would offer and implement its modified last best proposal on wages and insurance. It also stated that the duration of the contract would begin upon the execution of any agreement. In response to this communication, the Association immediately filed for mediation concerning wages, health insurance, and duration of agreement, and a mediation session was scheduled for January 21, 1993. On November 20, 1992, SAD 43 unilaterally implemented its wage proposal by including a wage increase in the employees' paychecks. SAD 43 implemented its insurance proposals effective December 1, 1992 by deducting payments from employees for insurance premiums, and ending premium payments for employees covered under a spouse's insurance plan.

In *Sanford Firefighters v. Ackerman,* No. 79–62 (Me.L.R.B. Dec. 5, 1979), the Board evaluated the employer's declaration of an impasse and found it deficient for the following reasons:

Substantial progress was being made; there were only three issues remaining to be resolved; and the parties expected to meet again on these issues after the fourth mediation session, as did the mediator. When Ackerman declared impasse he did so without consulting with the Association; he therefore could not, and admitted that he did not, know whether there was indeed a deadlock.

*Sanford Firefighters Ass'n,* No. 79–62, at 9. Although the Board was addressing a claim of impasse prior to the exhaustion of the statutorily mandated impasse resolution procedures, I reject SAD 43's contention that the Board's approach to impasse in this pre-exhaustion setting is irrelevant to the claim of impasse here. The factors cited by the Board in the *Sanford Firefighters* case are all present here: (1) The parties were making progress in their post-arbitration negotiations. (2) Few issues remained to be resolved. (3) The parties had agreed to meet to attempt to resolve the outstanding issues. (4) The impasse was declared without consultation with the Association. These undisputed facts do not support a finding that the parties were hopelessly deadlocked and unwilling to compromise. They do not support a finding that any future negotiations would have been fruitless. They only support a finding that SAD 43 lost its patience and, in so doing, implemented its last best offer in a manner that impermissibly denigrated the bargaining agent.[2] In these circumstances, I can only explain the Board's finding of an impasse by its unstated adoption of SAD 43's concept of statutory impasse.[3]

### SAD 43's Refusal to Bargain in Good Faith

The duty to negotiate in good faith includes the duty to participate in interest arbitration. As the Board notes in its decision, "[f]or that requirement to be meaningful, it must include the requirement to implement the arbitrator's binding determinations

**2.** *See Auburn Firefighters v. City of Auburn,* No. 89–01, at 23 (Me.L.R.B. Mar. 31, 1989).

**3.** I reject the Association's position that a unilateral request for renewed mediation in the post-arbitration period can defeat any finding of an impasse. That argument is simplistic and invites contrivance designed to defeat any possibility of a finding of an impasse. I also do not endorse the Association's view that the parties must repeat the cycle of statutory impasse resolution procedures. Rather, as already indicated, I agree with the Association's view that a declaration of impasse by the employer after the exhaustion of the statutory impasse resolution procedures should be subjected to the rigorous scrutiny historically applied to such a declaration.

unless overturned on appeal." SAD 43's refusal to implement the two year duration decision of the arbitrators violated that obligation. That refusal was unmistakably linked to SAD 43's last best proposal communicated to the Association in the post arbitration period. Specifically, the Board found as follows:

> Since the arbitrators' award was issued, MSAD 43 has consistently ignored the duration-of-agreement aspect of the award—making a "last best proposal" on duration in its September 15, 1992 letter to the Association (the offer being that the contract would be effective on the date of execution and expire on June 30, 1993); making the same "last best proposal" in its November 3rd letter; and including that last best proposal in a copy of the new contract mailed to the Association on November 28th. While the parties may agree to something other than what the interest arbitrators decided, neither party may unilaterally make changes in the award.

The refusal of SAD 43 to recognize its legal obligation to honor the arbitrators' decision on duration of contract, and the Association's strenuous objection to this refusal, unmistakably contributed to the inability of the parties to resolve their differences during the post-arbitration period. The Board abused its discretion when it concluded that there was an impasse justifying the unilateral implementation by the employer of wage and insurance provisions when the difficulty in resolving the outstanding issues was the result, in part, of unlawful action by the employer. As one commentator has noted: "The impasse exception to the unilateral action proscription goes hand in hand with good faith. Absent good faith bargaining there can be no impasse."[4] Again, I can explain the Board's indulgence of SAD 43's unilateral action despite a violation of the duty to bargain in good faith only because the violation occurred after the exhaustion of the mandated impasse resolution procedures. This position of the Board comes perilously close to an acceptance of the statutory impasse doctrine.

4. James W. Heller, *Unilateral Action in a Concession Bargaining Context,* 35 Lab.L.J. 747, 754 (1984).

For the reasons stated, I would vacate the decision of the Superior Court and direct the court to enter an order vacating the order of the Board dismissing the Association's prohibited practice complaint and remanding the matter to the Board with instructions to issue an order rescinding the unilateral actions of SAD 43 and ordering them to cease and desist from further unilateral changes.